IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT KROUPA, individually and<br>Derivatively on behalf of Garbus<br>Kroupa Entertainment, LLC | )<br>)<br>)<br>) | |
| Plaintiff, | ) | No. 08 CV 2691 |
| | ) | |
| JAMES D. GARBUS, | ) | |
| | ) | |
| Defendant. | ) | |

## OPPOSITION TO MOTION TO REMAND

### I.    Introduction

This Court should deny the Motion to Remand because:

(1)     Complete diversity of citizenship exists between the real parties in interest here. Plaintiff Robert Kroupa ("Kroupa") is a citizen of Illinois, and defendant James Garbus ("Garbus") is a citizen of New York.  Garbus Kroupa Entertainment LLC (the "LLC") is not a real party in interest to this action.  It was added simply as a pretense, in an attempt to defeat diversity jurisdiction.  Therefore, its citizenship does not control for diversity purposes; and

(2)     The LLC has no real interest here.  Kroupa's two supposedly derivative claims are an artifice.  All of Kroupa's claims are actually individual claims—against Garbus, the *only other member* of this two-member LLC.  Since diversity exists between Kroupa and Garbus, this Court should deny Kroupa's motion to remand, along with his audacious request for attorneys' fees and costs.

### II.    Facts

In late 2005, Kroupa and Garbus formed the LLC to develop motion pictures.  There are only two members of the LLC—Kroupa, who holds 60% of the units, and Garbus, who holds the

remaining 40%. (Schedule A to LLC Agreement, Exhibit A to Complaint, attached hereto as Exhibit 1). Their relationship soured, resulting in this dispute.

Kroupa initiated this action by filing a seven-count Complaint in state court against Garbus. (Complaint, pp. 6-17). Kroupa brought six of the seven counts individually. (Complaint, pp. 6-13; 15-17). Specifically, Kroupa brings claims for reformation, declaratory relief, breach of contract, breach of fiduciary duty, removal of manager, and inspection of documents and accounting. (Complaint, pp. 6-13; 15-17). Kroupa also brought two counts purportedly on behalf of the LLC, a second breach of fiduciary duty claim, and the claim for removal of manager, which Kroupa brings individually *and* derivatively. (Complaint, pp. 13-16).

Simultaneous with filing his state court complaint, Kroupa also filed identical allegations in an arbitration with the American Arbitration Association ("AAA"). (Demand for Arbitration, attached as Exhibit 2). Garbus has agreed to arbitration, as directed by the arbitration clause in the parties' LLC Agreement. The AAA is currently choosing an arbitrator. In light of the governing arbitration provision between the parties, Garbus will shortly file a motion to dismiss this action or in the alternative stay it pending the AAA arbitration.

## III.    Argument

### A.    Diversity Exists Between the Real Parties In Interest—Kroupa and Garbus.

Kroupa is correct when he states that the LLC is a citizen of both New York and Illinois. However, the citizenship of the LLC here is not controlling for diversity purposes because it is not a real party to the controversy. The citizens "upon whose diversity a plaintiff grounds jurisdiction must be real and substantial parties to the controversy." *Navarro Saving Assoc. v. Lee*, 446 U.S. 458, 460-61 (1980). "[A] federal court must disregard nominal or formal parties and rest jurisdiction only upon the citizenship of the real parties to the controversy." *Id; see*

2

*also*, *National Ass'n of Realtors v. Nat'l Real Estate Ass'n*, 894 F.2d 937, 940 (7th Cir. 1990) (finding that where agents not association were real parties in interest, citizenship of agents controlled for diversity purposes); *Northern Trust Co. v. Bunge Corp.*, 899 F.2d 591, 595 (7th Cir. 1990) (finding that where corporation acted only as representative for group of individuals and had no interest itself in outcome of litigation, citizenship of represented parties controlled).

The LLC is not a real party in interest. A real party in interest is one that "feels the blow" and is "at the front line" of the litigation. *CCC Info. Serv. Inc. v. American Salvage Pool Ass'n.*, 230 F.3d 342, 346 (7th Cir. 2000) (finding association, not its members, was real party in interest because it "feels the blow" and is "at the front line"). Kroupa and Garbus—not the LLC—are the only parties who will "feel the blow" and are "on the front line" of this litigation. Further, Kroupa—not the LLC—is the only party that stands to gain from Kroupa's derivative claims, as explained below.

Kroupa brings only two of his seven claims on behalf of the LLC. Both of these derivative claims are actually individual claims. First Kroupa claims, on behalf of the LLC *and individually*, that Garbus should be removed as manager. The LLC cannot remove a manager. Rather, a manager can only be terminated, "when the Members, acting by Consent, terminate the Person's status as Manager in such manner and on such terms and conditions as the Members may so determine." (Section 6.3 to LLC Agreement). The only members of the LLC are Kroupa and Garbus. Thus, Kroupa's removal of manager claim is solely an individual claim, not one he is pursuing derivatively on behalf of the LLC.

Despite its label, Kroupa's "derivative" claim for breach of fiduciary duty is similarly just an individual, not a derivative, claim. This is evident from Kroupa's prayer for relief, wherein he requests that the Court order "that Garbus not share in any amounts recovered by GKE

3

hereunder." (Complaint, p.15). Again, there are only two members of this LLC. If Garbus cannot share in any amounts received by the LLC, then any amount awarded to the LLC goes directly to Kroupa—and Kroupa only. Therefore, while although Kroupa brings this claim on behalf of the LLC, it is really just a masked individual claim for his benefit.

Kroupa cannot transform the LLC into a real party in interest simply by disguising a couple of his individual claims as derivative claims. The LLC is not a real party at issue here. As such, its citizenship should not control for diversity purposes. *CCC*, 230 F.3d at 346. This dispute is between the two and only members of the LLC—one who is a citizen of New York and the other who is a citizen of Illinois. Therefore, complete diversity exists, and this Court can properly exercise jurisdiction over this matter pursuant to 28 U.S.C. §1332(a).

**B.      Kroupa Is Not Entitled To Attorneys' Fees or Costs under 28 U.S.C. §1447(c).**

Garbus has objectively reasonable grounds to believe that removal is legally proper. If a defendant's basis for removal is objectively reasonable, a plaintiff is not entitled to attorneys' fees and costs under 28 U.S.C. §1447(c). *Lott v. Pfizer*, 492 F.3d 789, 793 (7th Cir. 2007) (reversing fee award where defendant had objectively reasonable basis for removal based on its interpretation of statute). The Seventh Circuit in *Lott* put forth a general rule for determining if a defendant's basis is "objectively reasonable." The Court found,

> [a]s a general rule, if at the time defendant filed his notice in federal court, clearly established law demonstrated that he had no basis for removal, then a district court should award attorneys' fees. By contrast, if clearly established law did not foreclose a defendant's basis for removal, then a district court should not award attorneys' fees.

*Lott*, 492 F.3d at 793; *see Wisconsin v. Agmen Inc.*, 516 F.3d 530, 534 (7th Cir. 2008) (on defendant's third attempt to remove, affirming district court's remand to state court, but reversing district court's award of fees and costs).

4

Clearly established law from the United States Supreme Court and the Seventh Circuit instructs the Court not consider the citizenship of a merely nominal party to an action, such as the LLC here, in making its determination of diversity jurisdiction. *See Navarro*, 446 U.S. at 460-61; *National Ass'n of Realtors,* 894 F.2d at 940; *Northern Trust Co.*, 899 F.2d at 595; *CCC*, 230 F.3d at 346. Clearly established law not only fails to foreclose Garbus' basis for removal, it instructs this Court to find complete diversity and allow Garbus to remain in federal court. This request for sanctions is itself sanctionable, and should be denied.

## IV.    Conclusion

For the foregoing reasons, Kroupa's motion to remand and his request for costs and fees should both be denied.

JAMES D. GARBUS


By: s/Rachael G. Pontikes


Frederick R. Ball (ARDC #06236660)
Rachael G. Pontikes (ARDC #06275709)
Duane Morris LLP
190 South LaSalle Street, Suite 3700
Chicago, Illinois   60603
(312) 499-6700
(312) 499-67001 (fax)

5

## CERTIFICATE OF SERVICE

The undersigned certifies that on August 12, 2008 she electronically filed the foregoing **Opposition to Motion to Remand** with the Clerk of the Court, using the Court's CM/ECF system, which will send electronic notification of the filing to the below CM/ECF participants. Parties may access this filing through the Court's system.

Stephen Novack
Stephen J. Siegel
Molly S. DiRago
Novack and Macey LLP
100 North Riverside Plaza
Chicago, IL   60606-1501


                                                        s/Rachael G. Pontikes
                                                        Rachael G Pontikes

DM1\1356398.3

# EXHIBIT 1

### IN THE CIRCUIT COURT OF COOK COUNTY ILLINOIS
### COUNTY DEPARTMENT, CHANCERY DIVISION

ROBERT KROUPA, individually and      )
derivatively on behalf of GARBUS KROUPA   )
ENTERTAINMENT, LLC,                 )
                               )
         Plaintiff,            )
                               )
    v.                            )    Case No. _____
                               )
JAMES D. GARBUS,            )
                               )
         Defendant.        )

### COMPLAINT FOR REFORMATION, DECLARATORY AND OTHER RELIEF

Plaintiff Robert Kroupa ("Kroupa"), in his individual capacity and derivatively on behalf of Garbus Kroupa Entertainment, LLC ("GKE"), by his attorneys, Novack and Macey LLP, states as follows for his complaint against Defendant James D. Garbus ("Garbus"):

### NATURE OF THE CASE

1. In late 2005, Plaintiff Kroupa and Defendant Garbus formed GKE, a Delaware limited liability company ("LLC"). Kroupa brings this action both in his individual capacity and derivatively on behalf of GKE. Individually, Kroupa seeks reformation of the written GKE LLC agreement to conform it to the terms that he and Garbus actually agreed upon; in the alternative to reformation, Kroupa seeks certain declaratory relief. In addition, individually and/or derivatively on GKE's behalf, Kroupa seeks remedies for Garbus' multiple, flagrant breaches of his contractual and fiduciary duties. Those remedies include money damages, inspection of GKE records, an accounting and a judicial order removing Garbus as a manager of GKE.

## PARTIES

2.     Kroupa is an individual who resides in Chicago, Illinois. He is one of the two managers, and one of the two members, of GKE.

3.     GKE is a Delaware limited liability company with its principal office in New York, New York.

4.     Garbus is an individual who resides outside of the State of Illinois. He is the other manager and member of GKE.

## PERSONAL JURISDICTION

5.     This Court has personal jurisdiction over Garbus under subsections 2-209(a)(1), 2-209(a)(7) and/or 2-209(c) of Illinois' long-arm statute. 735 ILCS 5/2-209. Among other things, Garbus availed himself of the laws of Illinois in connection with GKE by: (a) soliciting and negotiating the subject contract via written and oral communications to Kroupa in Illinois; (b) transacting GKE business while Garbus was physically present in Illinois; and (c) sending written and oral communications relating to GKE, and to the performance of the subject contract, to Kroupa in Illinois. Additionally, the subject contract contains an Illinois choice of law provision.

## VENUE

6.     Venue is proper in this Court pursuant to the Illinois Code of Civil Procedure, 735 ILCS 5/2-101, in that the cause of action alleged herein, or some part thereof, arose out of transactions that occurred in Cook County, Illinois.

## GENERAL ALLEGATIONS

7.    Several years ago, Kroupa was introduced to Garbus, a New York attorney who claimed to have contacts and experience in the film industry. Kroupa, too, was interested in the film industry, but had no prior experience with film investing, development or production.

**Oral Agreement**

8.    In December 2005, Kroupa and Garbus agreed to form a business partnership for the purpose of developing a motion picture tentatively titled "Save Me." Kroupa and Garbus met at a restaurant in New York City in early December, 2005. Later that month, they spoke on one or more occasions by telephone. In the meeting and telephone conversation(s), Kroupa and Garbus discussed and agreed to form and operate a partnership to develop "Save Me," and to various terms of their agreement.

9.    Among other things, Garbus and Kroupa agreed, and had a meeting of the minds, that Kroupa would contribute certain cash to "Save Me," while Garbus would oversee the project to ensure that the film was produced and distributed and that Kroupa's cash investment was properly preserved and protected. Kroupa agreed to invest approximately $1.3 million in "Save Me," subject to various terms and conditions.

10.    In the same meeting and conversation(s), Garbus expressly agreed that Kroupa would be entitled to recoup an amount equal to his cash investment, plus a 20% return thereon, before any profits, cash flow, or other distributions were provided to Garbus (hereafter, the "120% Return Provision"). The parties agreed that after (but only after) Kroupa received 120% of his investment, profits would be distributed on a 60/40 basis, i.e., Kroupa would receive 60% of every such distribution and Garbus 40%.

Case 1:08-cv-02691    Document 18-2    Filed 08/12/2008    Page 5 of 18

Case 1:08-cv-02691    Document 8-2    Filed 05/23/2006    Page 9 of 22
Case 1:08-cv-02691    Document 1-2    Filed 05/08/2008    Page 5 of 18

11.    In a telephone conversation in or around December 2005, Garbus and Kroupa further agreed to form an LLC, i.e., GKE, and that each of them would be managers of GKE.

12.    The foregoing oral agreement, including the 120% Return Provision, was, and is, a valid and enforceable agreement.

## Written GKE Agreement

13.    The parties undertook to memorialize the foregoing agreement in writing. In or around December, 2005, attorney Garbus drafted what ultimately became the Garbus Kroupa Entertainment Limited Liability Company Agreement (the "Written GKE Agreement"), an executed copy of which is attached as Exhibit A to this Complaint.

14.    Kroupa asked his long-time Chicago real estate attorney, Elka Geller Nelson ("Nelson"), to review the draft Written GKE Agreement that Garbus had prepared.

15.    In telephone conversations held in or around December, 2005, Garbus advised and represented to Nelson that he and Kroupa had agreed to the 120% Return Provision as a part of their deal and that such Provision was contained in a side letter agreement between Kroupa and him. Consistent therewith, Section 10.3 of the Written GKE Agreement expressly provides that the parties' entire agreement includes a letter agreement between Kroupa and Garbus.

16.    However, contrary to what Garbus told Nelson, and unbeknownst to Nelson, the letter agreement referred to in the Written GKE Agreement does not contain the 120% Return Provision.

17.    Thus, Garbus either intentionally or mistakenly omitted the 120% Return Provision from the Written GKE Agreement, and the Written GKE Agreement did not fully and accurately reflect the earlier oral agreement between Kroupa and Garbus described in paragraphs 8 through 12 above.

4

18.    The Written GKE Agreement includes various terms and conditions governing Garbus' conduct as a Manager of GKE, including, but not limited to, those outlined immediately below.

19.    Section 1.1(x) identifies Garbus and Kroupa as the Managers of GKE.

20.    Section 3.1(a) provides that Kroupa was contributing to GKE certain specified cash and Garbus was contributing "Intellectual Property and Proprietary Information Arising out of Motion Picture Products and their Development."

21.    Section 10.14(c) requires Garbus "to continue to provide executive producer services with respect to any motion picture project for a minimum of two years following the date of the financing of such motion picture."

22.    Sections 3.1(a) and 3.2(a) provide, however, that Garbus' capital account will not be credited "in respect of services rendered to the Company or contribution of intellectual property and proprietary information arising out of motion picture products and their development . . . other than any allocation of Profit under this Agreement[.]"

23.    Article V requires GKE to maintain "complete and accurate books and records" at its principal offices in New York, to allow any member to inspect and copy same, and to provide each member with, among other things, a balance sheet and income statement each year.

24.    Under Section 6.1, the approval of both Managers was required for GKE to, among other things, enter into contracts and acquire interests in movies.

25.    Section 6.2(b) addresses amendments to the Written GKE Agreement, but does not require that amendments be in writing or signed.

26.    Section 6.5(a) provides that a Manager "shall act in good faith and with that degree of care that an ordinarily prudent Person in a like position would use under similar

Case 1:08-cv-02691    Document 8-2    Filed 05/23/2008    Page 11 of 22
Case 1:08-cv-02691    Document 1-2    Filed 05/08/2008    Page 7 of 18

circumstances and shall perform diligently and faithfully [his] duties for the benefit of the Company[.]"

## GKE Projects

27.    At various points after the Written GKE Agreement was signed, Garbus reiterated the 120% Return Provision to Kroupa (and others) and that it was binding between Kroupa and him.

28.    Kroupa relied on the foregoing statements, without limitation, by investing additional cash in GKE entertainment projects after making his initial approximately $1.3 million investment in "Save Me."

29.    In that regard, among other things, Kroupa contributed an additional approximately $9 million to GKE to fund all or part of four other entertainment projects, namely, films tentatively titled "Dream Boy," "Brooklyn To Manhattan" and "Latin Lyrics," and a recorded stage production titled "Bobby Jones Comedy All Stars: Volume 1."

30.    None of the four films in which Kroupa and GKE invested -- "Save Me," "Dream Boy," "Brooklyn To Manhattan" and "Latin Lyrics" -- has been distributed theatrically.

31.    "Bobby Jones Comedy All Stars: Volume I" was released to video, but Garbus has failed to provide to Kroupa any funds generated for GKE by that production, despite Kroupa's demands for same.

## COUNT I

### Reformation

### (By Kroupa Individually)

32.    Paragraphs 1 through 31 above are incorporated by reference as if fully set forth herein.

Case 1:08-cv-02691    Document 18-2    Filed 08/12/2008    Page 8 of 18

Case 1:08-cv-02691    Document 8-2    Filed 05/23/2008    Page 12 of 22
Case 1:08-cv-02691    Document 1-2    Filed 05/08/2008    Page 8 of 18

33.    It was unknown to Kroupa when he signed the Written GKB Agreement that it did not expressly recite the parties' earlier oral agreement to the 120% Return Provision.  In fact, Kroupa first learned that the Written GKB Agreement did not expressly recite the 120% Return Provision in or around the summer of 2007.

34.    The 120% Return Provision was omitted from the Written GKB Agreement as a result of – in the alternative -- either: (a) a mutual mistake by both parties, or (b) fraud by Garbus and a unilateral mistake by Kroupa.

WHEREFORE, Kroupa prays for the entry of judgment in his favor and against Garbus, as follows:

A.    Reforming the Written GKB Agreement by inserting the 120% Return Provision;

B.    Awarding Kroupa his costs incurred in this action; and

C.    Awarding Kroupa such other and further relief as is appropriate.

## ALTERNATIVE COUNT II

### Declaratory Relief

### (By Kroupa Individually)

35.    Paragraphs 1 through 31 above are incorporated by reference as though fully set forth herein.

36.    Kroupa has an interest in receiving a return of his investment, plus 20%, before any profits, cash flow, or other distributions are provided to Garbus (i.e., the 120% Return Provision).

37.    Garbus, among other things, has failed to abide by the 120% Return Provision and, recently, has also failed to confirm that the 120% Return Provision is part of the parties' agreement.  Accordingly, Garbus has an opposing interest regarding the 120% Return Provision

7

Case 1:08-cv-02691    Document 18-2    Filed 08/12/2008    Page 9 of 18

Case 1:08-cv-02691    Document 8-2    Filed 05/23/2008    Page 13 of 22
Case 1:08-cv-02691    Document 1-2    Filed 05/08/2008    Page 9 of 18

and the parties have an actual controversy regarding the terms under which Kroupa is entitled to a return of, and a return on, his investment.

38.    The relief requested herein will terminate all or some part of that controversy.

39.    In the event that the Written GKE Agreement is not reformed to include the 120% Return Provision as requested in Count I above, then, in the alternative thereto, Kroupa alleges that by virtue of, among other things, the matters alleged in Paragraphs 27 through 29 above: (a) the Written GKE Agreement was amended to include the 120% Return Provision; and/or (b) Garbus is estopped to deny that the 120% Return Provision is binding and enforceable between Kroupa and him.

40.    In all events, in the alternative to the allegations of Count I and the preceding paragraph, Kroupa is entitled to receive all distributions of any kind from GKE up to the amount of his total capital contributions to GKE, before any GKE funds are distributed to Garbus.

WHEREFORE, if, but only if, this Court declines to reform the Written GKE Agreement to include the 120% Return Provision, then Kroupa, in the alternative to such relief, respectfully requests entry of judgment in his favor and against Garbus:

A.    Declaring that Kroupa is entitled to the return of an amount equal to all of his cash investments in GKE, totaling in excess of $10 million, plus a 20% return thereon, before Garbus receives any further cash or distributions of any kind from GKE or its projects;

B.    In the alternative to the declaration requested in the immediately preceding prayer, declaring that Kroupa is entitled to receive all distributions of any kind from GKE up to the amount of his total capital contributions to GKE, before any GKE funds are distributed to Garbus;

C.    Awarding Kroupa his costs incurred in this action; and

8

Case 1:08-cv-02691    Document 18-2    Filed 08/12/2008    Page 10 of 18

Case 1:08-cv-02ᴜᴜ I    Document 8-2    Filed 05/23/200ᴜ    Page 14 of 22
Case 1:08-cv-02ᴜᴜ I    Document 1-2    Filed 05/08/200ᴜ    Page 10 of 18

D.    Awarding Kroupa such other and further relief as is appropriate.

## COUNT III

### Breach Of Contract

### (By Kroupa Individually)

41.    Paragraphs 1 through 31 above are incorporated by reference as if fully set forth herein.

42.    Garbus breached the Written GKE Agreement by, among other things:

a.    Purporting to commit GKE to invest substantially more money in one or more entertainment projects than was disclosed to, or agreed to by, Kroupa;

b.    Transferring to himself a purported financing fee for the "Latin Lyrics" project in the amount of $260,000, without Kroupa's knowledge or consent. Under Section 10.14(b) of the Written GKE Agreement and otherwise, Garbus was entitled to receive, if anything, no more than about a $34,000 financing fee with respect to "Latin Lyrics";

c.    Failing to disburse to Kroupa in accordance with the Written GKE Agreement and/or the 120% Return Provision funds that GKE received from one or more entertainment projects in which it invested, including, without limitation, the "Bobby Jones Comedy All Stars: Volume I";

d.    Transferring to himself interest earned on funds that Kroupa, through GKE, placed in escrow to finance GKE projects, while providing none of such interest to Kroupa;

e.    Failing to provide to Kroupa the economic benefit of a tax credit received from the State of New Mexico for filming "Save Me";

Case 1:08-cv-02691     Document 18-2     Filed 08/12/2008     Page 11 of 18

Case 1:08-cv-026~1     Document 8-2     Filed 05/23/200~     Page 15 of 22
Case 1:08-cv-02~     Document 1-2     Filed 05/08/20~     Page 11 of 18

f.     Failing to provide to Kroupa financial statements and other books and records of GKE despite numerous written and oral demands for same; and

g.     Failing to share information with Kroupa, and to answer his requests for information, concerning GKE and its projects.

43.     Kroupa has performed, or is excused from performing, all obligations required of him under the Written GKE Agreement.

44.     As a direct and proximate result of Garbus' breaches of the Written GKE Agreement, Kroupa has been damaged in an amount exceeding $2 million.

WHEREFORE, Kroupa prays for the entry of judgment in his favor and against Garbus, awarding Kroupa:

A.     Compensatory damages in an amount to be determined after trial;

B.     Prejudgment interest at the statutory rate of five percent per annum;

C.     His costs incurred in this action; and

D.     Such other and further relief as is appropriate.

## COUNT IV

### Breach Of Fiduciary Duty

### (By Kroupa Individually)

45.     Paragraphs 1 through 31 above are incorporated by reference as though fully set forth herein.

46.     By reason of the foregoing, Garbus owed Kroupa fiduciary duties of care, loyalty and good faith.

47.     Garbus breached the foregoing duties by, among other things:

Case 1:08-cv-02691    Document 18-2    Filed 08/12/2008    Page 12 of 18

Case 1:08-cv-026ɔ1    Document 8-2    Filed 05/23/200ɔ    Page 16 of 22
Case 1:08-cv-02ɔɔ1    Document 1-2    Filed 05/08/200ɔ    Page 12 of 18

a.    Purporting to commit GKE to invest substantially more money in one or more entertainment projects than was disclosed to, or agreed to by, Kroupa;

b.    Transferring to himself a purported financing fee for the "Latin Lyrics" project in the amount of $260,000, without Kroupa's knowledge or consent. Under Section 10.14(b) of the Written GKE Agreement and otherwise, Garbus was entitled to receive, if anything, no more than about a $34,000 financing fee with respect to "Latin Lyrics";

c.    Failing to disburse to Kroupa in accordance with the Written GKE Agreement and/or the 120% Return Provision funds that GKE received from one or more entertainment projects in which it invested, including, without limitation, the "Bobby Jones Comedy All Stars: Volume I";

d.    Transferring to himself interest earned on funds that Kroupa, through GKE, placed in escrow to finance GKE projects, while providing none of such interest to Kroupa;

e.    Failing to provide to Kroupa the economic benefit of a tax credit received from the State of New Mexico for filming "Save Me";

f.    Demanding a release from Kroupa of all claims against Garbus in exchange for releasing certain funds escrowed in connection with the "Latin Lyrics" project;

g.    Failing to provide to Kroupa financial statements and other books and records of GKE despite numerous written and oral demands for same;

h.    Failing to share information with Kroupa, and to answer his requests for information, concerning GKE and its projects;

i.    Failing to obtain outside financing for one or more entertainment projects in which Kroupa, through GKE, invested, including, without limitation, "Brooklyn To

Manhattan," contrary to, among other things, Garbus' representations and inducements to Kroupa to invest in such projects;

     j.   Failing to negotiate project agreements that, consistent with the Written GKE Agreement, industry standards and Garbus' duty to properly preserve and protect Kroupa's investments, gave GKE management and/or ownership control over the funding and production of each entertainment project in which GKE invested;

     k.   Failing to insist, consistent with the Written GKE Agreement, industry standards and Garbus' duty to properly preserve and protect Kroupa's investments, that an auditor answerable to GKE, or its functional equivalent, be retained on each entertainment project in which Kroupa, through GKE, invested;

     l.   Failing to insist, consistent with the Written GKE Agreement, industry standards and Garbus' duty to properly preserve and protect Kroupa's investments, that a completion bond be posted in favor of GKE on each entertainment project in which Kroupa, through GKE, invested;

     m.   Allowing the "Brooklyn To Manhattan" project to go substantially over-budget because of, among other things, inadequate spending controls and mismanagement, including with respect to funds that Kroupa, through GKE, invested in such projects;

     n.   Squandering and mishandling one or more distribution opportunities on entertainment projects in which Kroupa, through GKE, invested, including, without limitation, a distribution deal for "Save Me" offered by Roadside Attractions LLC; and

     o.   Otherwise grossly mismanaging entertainment projects in which Kroupa, through GKE, invested.

48.    Garbus' breaches of fiduciary duty were intentional, willful, wanton and/or malicious in that, among other things, they were intended solely to benefit Garbus at the expense, and to the detriment, of Kroupa, his co-manager and co-member in GKE.

49.    As a direct and proximate result of Garbus' breaches of fiduciary duty, Kroupa has been damaged in an amount exceeding $2 million.  Had Garbus performed his fiduciary duties as required, Kroupa would not have suffered such losses.

WHEREFORE, Kroupa prays for the entry of judgment in his favor and against Garbus, awarding Kroupa:

A.    Compensatory damages in an amount to be determined after trial;

B.    Punitive damages in an amount to be determined after trial, but no less than $5 million;

C.    His costs incurred in this action; and

D.    Such other and further relief as is appropriate.

## COUNT V

### Breach Of Fiduciary Duty

### (By Kroupa Derivatively On Behalf Of GKE)

50.    Paragraphs 1 through 31 above are incorporated by reference as though fully set forth herein.

51.    By reason of the foregoing, Garbus owed GKE fiduciary duties of care, loyalty and good faith.

52.    Garbus breached the foregoing duties by, among other things:

a.    Purporting to commit GKE to invest excessive, highly imprudent amounts of money in one or more entertainment projects without Kroupa's knowledge or consent;

13

  b.  Failing to obtain outside financing for one or more entertainment projects in which GKE invested, including, without limitation, "Brooklyn To Manhattan";

  c.  Failing to negotiate project agreements that, consistent with the Written GKE Agreement and industry standards, gave GKE management and/or ownership control over the funding and production of each entertainment project in which GKE invested;

  d.  Failing to insist, consistent with the Written GKE Agreement and industry standards, that an auditor answerable to GKE, or its functional equivalent, be retained on each entertainment project in which GKE invested;

  e.  Failing to insist, consistent with the Written GKE Agreement and industry standards, that a completion bond be posted in favor of GKE on each entertainment project in which it invested;

  f.  Allowing the "Brooklyn To Manhattan" project to go substantially over-budget because of, among other things, inadequate spending controls and mismanagement;

  g.  Squandering and mishandling one or more distribution opportunities on entertainment projects in which GKE invested, including, without limitation, a distribution deal for "Save Me" offered by Roadside Attractions LLC; and

  h.  Otherwise grossly mismanaging GKE's entertainment projects.

  53.  Garbus' breaches of fiduciary duty were intentional, willful, wanton and/or malicious in that, among other things, they were intended solely to benefit Garbus at the expense, and to the detriment, of GKE.

  54.  As a direct and proximate result of Garbus' breaches of fiduciary duty, GKE has been damaged in an amount exceeding $2 million. Had Garbus performed his fiduciary duties as required, GKE would not have suffered such losses.

55.    A demand on Garbus to cause GKE to seek redress against him for these wrongs would be futile.

WHEREFORE, Kroupa, derivatively on behalf of GKE, prays for the entry of judgment in favor of Kroupa and/or GKE and against Garbus, as follows:

A.    Awarding compensatory damages in an amount to be determined after trial;

B.    Awarding punitive damages in an amount to be determined after trial, but no less than $5 million;

C.    Ordering that Garbus not share in any amounts recovered by GKE hereunder;

D.    Awarding Kroupa his attorneys' fees and litigation expenses incurred in bringing this claim on behalf of GKE, in an amount to be determined after trial or hearing;

E.    Awarding Kroupa his costs incurred in this action; and

F.    Awarding GKE, and/or Kroupa derivatively, such other and further relief as is appropriate.

## COUNT VI

### Removal As Manager

#### (By Kroupa Individually and Derivatively)

56.    Paragraphs 1 through 31, 47, 48, 52 and 53 above are incorporated by reference as though fully set forth herein.

57.    By reason of the foregoing, Garbus owed GKE and Kroupa fiduciary duties of care, loyalty and good faith.

Case 1:08-cv-02691    Document 8-2    Filed 05/23/2008    Page 21 of 22
Case 1:08-cv-02691    Document 1-2    Filed 05/08/2008    Page 17 of 18

58.    By reason of the foregoing, Garbus breached his fiduciary duties to GKE and Kroupa.

59.    By reason of his multiple, flagrant breaches of fiduciary duty, Garbus should be judicially removed as a manager of GKE.

60.    A demand on Garbus to cause GKE to seek to remove him as a manager would be futile.

WHEREFORE, Kroupa prays for the entry of judgment in his favor and against Garbus, as follows:

A.    Ordering that Garbus be and is removed as a manager of GKE;

B.    Awarding Kroupa his costs incurred in bringing this action individually and/or derivatively on behalf of GKE; and

C.    Awarding Kroupa, individually and/or derivatively on behalf of GKE, such other and further relief as is appropriate.

## COUNT VII

### Inspection Of Documents/Accounting

### (By Kroupa Individually)

61.    Paragraphs 1 through 31, 42, 43, 46 and 47 above are incorporated by reference as though fully set forth herein.

62.    By reason of Article V of the Written GKE Agreement and applicable law, Kroupa is entitled, without limitation, to receive annual financial statements for GKE and to inspect GKE's books and records.

16

Case 1:08-cv-02691     Document 18-2     Filed 08/12/2008     Page 18 of 18

Case 1:08-cv-02691     Document 8-2     Filed 05/23/2008     Page 22 of 22
Case 1:08-cv-02691     Document 1-2     Filed 05/08/2008     Page 18 of 18

63.    Despite the foregoing and Kroupa's numerous requests for such financial statements, books and records, Garbus has failed to provide Kroupa with various of GKE's books, records and financial statements.

64.    By reason of the foregoing, Kroupa is also entitled to an accounting of all of GKE's accounts and transactions.

WHEREFORE, Kroupa prays for the entry of judgment in his favor and against Garbus, as follows:

A.    Ordering that Kroupa be permitted to inspect and copy all books and records of GKE;

B.    Ordering Garbus to provide Kroupa with GKE's annual financial statements from its inception;

C.    Ordering Garbus to provide Kroupa with a full and accurate accounting of all GKE accounts and transactions;

D.    Awarding Kroupa his costs incurred in this action; and

E.    Awarding Kroupa such other and further relief as is appropriate.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims triable to a jury.

Respectfully submitted,

ROBERT KROUPA, individually and derivatively
on behalf of GARBUS KROUPA
ENTERTAINMENT, LLC

By: _____
    One of His Attorneys

17

# EXHIBIT A
# TO
# EXHIBIT 1
# (PART 1)

MAR-26-2007 12:03PM   FROM-Elka Geller Nelson & Associates LLC        +        T-666  P.008/040  F-372

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## GARBUS KROUPA ENTERTAINMENT, LLC

### (A Delaware Limited Liability Company)

LIMITED LIABILITY COMPANY AGREEMENT dated as of December 14, 2005, by and between the Persons signing below.

### WITNESSETH:

WHEREAS, the parties desire to form and become the members of a Delaware limited liability company to be known as GARBUS KROUPA ENTERTAINMENT, LLC (the "*Company*") for the purpose of conducting the Business; and

WHEREAS, the parties desire to provide herein for the management and the conduct of the business and affairs of the Company and their relative rights and obligations with respect thereto;

NOW, THEREFORE, in consideration of the premises and the mutual covenants hereinafter provided, and other good and valuable consideration, the legal adequacy of which is acknowledged, the parties hereto hereby agree as follows:

### ARTICLE I

### DEFINITIONS

Section 1.1    Certain Defined Terms.    The following capitalized terms are used herein as defined below:

(a)    "*Acceptance Notice*" means a written notice in which the Company or an Other Member (as the case may be) states, if, and the extent to which, the Company or the Other Member (as the case may be) elects to redeem or purchase an Offered Interest in accordance with Article VIII.

(b)    "*Accepting Member*" means each Other Member giving an Acceptance Notice to an Offer Member in accordance with Section 8.3(c).

(c)    "*Act*" means the Delaware Limited Liability Company Act, as amended.

(d)    "*Affiliate*" means, with respect to a Person, another Person directly or indirectly Controlling, Controlled by, or under common Control with, such Person.

(e) *"Agreement"* means this limited liability company agreement, including any schedules and exhibits hereto, as supplemented, amended or restated from time to time in the manner provided herein.

(f) *"Bankruptcy Event"* means, with respect to any Person, the occurrence of any of the events specified in either Section 18-304(a) or Section 18-304(b) of the Act (applied as if such Person were a member within the meaning of the Act).

(g) *"Business"* means, (1) initially, the business of developing motion picture projects and (2) any other lawful business, purpose, or activity, whether or not for profit, with the exception of the business of granting policies of insurance, assuming insurance risks or banking as defined in section 126 of Title 8 of the Delaware General Corporation Law.

(h) *"Capital Account"* means an account maintained on the books of the Company pursuant to Section 3.2.

(i) *"Cash Flow"* means, with respect to any Fiscal Year (or other specified period), the amount by which the sum of (1) the gross cash receipts received during such Fiscal Year (or other specified period) and (2) the amount of any reduction in the Reserves exceeds the sum of (3) the gross cash expenditures made during such Fiscal Year (or other specified period) and (4) the amount of any increase in the Reserves.

(j) *"Code"* means the Internal Revenue Code of 1986, as amended.

(k) *"Company"* has the meaning set forth in the preamble.

(l) *"Consent"* of the Members means the approval, authorization, consent or ratification of Members owning more than eighty (80%) (or other proportion otherwise specified in this Agreement) of the Units entitled to vote thereon at a meeting duly held pursuant to this Agreement or given by such Members in an instrument duly executed and delivered in the manner provided herein.

(m) *"Control"* of a Person means the power (whether or not exercised) to direct the policies, operations or activities of such Person by or through the ownership of, or right to vote, or to direct the manner of voting of, securities of such Person, or pursuant to law or agreement, or in any other manner.

(n) *"Covered Person"* means any Person who or that is or was a Holder, Manager, Officer or any Successor of any of the foregoing.

(o) *"Damages"* means any loss, damage, liability, obligation, deficiency, fine, debt, claim, action, suit, proceeding, demand, assessment, penalty, interest, injunction, order, judgment, payment, expenditure, expense, reduction in benefit, tax, addition to tax or any other similar item, plus any reasonable attorney fees relating to any of the foregoing.

(p) *"Disability Event"* means, with respect to a Person, (1) the inability of the Person, as a result of any physical or mental disability or incapacity, to perform any material duties of the Person under this Agreement, any employment agreement, or other agreement

MAR-26-2007  12:03PM    FROM-Elka Geller Nelson & Associates LLC       +                    T-666  P.010/040  F-372

related to the conduct of the Business for a period of one-hundred eighty (180) consecutive days or two-hundred seventy (270) days during any period of three-hundred sixty-five (365) consecutive days or (2) the entry of judgment of a court of competent jurisdiction adjudicating the Person to be incompetent to manage the Person's property or person.

(q)    *"Distribution Interest"* means any and all of the rights, obligations and duties as provided in Article III, Article IV, Section 5.5(a)(1), Section 5.6, Article VI (other than Section 6.2), Article IX, Article X, and Article I to the extent necessary to apply or interpret any of the foregoing.

(r)    *"Fiscal Year"* means the annual accounting period used by the Company for tax or financial reporting purposes, as the case may be.

(s)    *"Gross Asset Value"* means with respect to any Company asset, the adjusted basis of the asset for United States federal income tax purposes, except as follows:

(1)  the initial Gross Asset Value of any asset contributed by a Holder to the Company shall be the gross fair market value (as determined by the Managers) of such asset as of the date of such contribution;

(2)  the Gross Asset Value of each asset shall be adjusted to equal its gross fair market value (as determined by the Managers) at the following times: (i) the acquisition of a new or additional Interest in the Company by any Person in exchange for more than a *de minimis* capital contribution; (ii) the acquisition of a new or additional Interest by any person in exchange for the performance of services by such Person if and to the extent that such adjustment is necessary to limit, in whole or in part, such Person's Interest to a participation in future profits (within the meaning of Rev. Proc. 93-27, 1993-2 C.B. 343); (iii) the distribution by the Company to a Holder of more than a *de minimis* amount of Company assets (other than cash) with respect to its Interest unless the Managers reasonably determine that such adjustment is not necessary to reflect the relative economic interests of the Holders in the Company; and (iv) the liquidation of the Company within the meaning of Treas. Reg. §1.704-1(b)(2)(ii)(g);

(3)  the Gross Asset Value of an asset distributed to any Holder shall be the fair market value of such asset as of the date of distribution as determined in good faith by the Managers;

(4)  the Gross Asset Value of each asset shall be increased or decreased, as the case may be, to reflect any adjustments to the adjusted basis of such asset pursuant to Section 734(b) or 743(b) of the Code, but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treas. Reg. §1.704-1(b)(2)(iv)(m); *provided, however, that* Gross Asset Value shall not be adjusted pursuant to this subparagraph (4) to the extent the Managers determine that an adjustment pursuant to subparagraph (2) above is necessary or appropriate in conjunction with a transaction that would otherwise result in an adjustment pursuant to this subparagraph; and

(5)  if the Gross Asset value of an asset has been determined or adjusted pursuant to subparagraphs (1), (2) or (4) above, such Gross Asset Value shall

-4-

MAR-26-2007  12:03PM   FROM-Elka Geller Nelson & Associates LLC        +        T-666  P.011/040  F-372

thereafter be adjusted to reflect the depreciation or amortization taken into account with respect to such asset for purposes of computing Profit or Loss.

(t)   *"Holder"* means a Member or a Person (other than a Member) owning an Interest.

(u)   *"Interest"* means (1) in the case of a Person admitted as a Member, any and all rights, powers, duties and obligations of a Member (including, without limitation, the right to inspect the books and records of the Company, to transfer to a Permitted Transferee in accordance with Section 8.2, to sell or participate in a sale under Section 8.3 and to participate in the management of the Company) as provided in this Agreement or applicable law, or (2) in the case of a Person not admitted as Member, a Distribution Interest.

(v)   *"JDG"* means James D. Garbus, an individual.

(w)   *"Liquidating Trustee"* means the Managers, unless another Person or Persons is designated by Consent of the Members or otherwise in accordance with the terms of this Agreement.

(x)   *"Managers"* means initially, RK and JDG or any other Person or Persons designated by Consent of the Members or otherwise in accordance with the terms of this Agreement.

(y)   *"Member"* means any Person admitted as a member of the Company pursuant to the provisions of this Agreement and the Act, as set forth on Schedule A.

(z)   *"Note"* means an unsecured, non-negotiable promissory note with a term of five (5) years, the principal balance of which shall amortize in equal, semi-annual installments over such term. Interest shall accrue, and be paid semi-annually, on the unpaid principal amount, at a rate per annum equal to the applicable federal rate (as such term is defined in Section 1274 of the Code) in effect for the calendar month including the date of issuance. Principal may be pre-paid at any time without penalty in the inverse order in which installments of principal would otherwise have been due.

(aa)   *"Offer"* means a bona fide offer (other than an offer resulting from or relating to a Terminating Event) from a one or more Persons (other than a Permitted Transferee) to purchase all or any portion of a Member's Interest; *provided that* the only consideration paid or to be paid under the offer is cash (in the form of U.S. dollars) or an obligation (with a term not to exceed five (5) years from the purchase date) to pay cash (in the form of U.S. dollars).

(bb)   *"Offer Member"* means a Member receiving an Offer.

(cc)   *"Offer Notice"* means a written notice setting forth all material terms of an Offer, including, but not limited to, the identity of and all relevant information (including, but not limited to, financial statements for the most recent fiscal year) relating to each Offeror, a detailed description of the Offered Interest, the purchase price for the Offered Interest, payment terms and financing arrangements.

MAR-26-2007  12:03PM  FROM-Elka Geller Nelson & Associates LLC        +                    T-666  P.012/040  F-372

(dd)   *"Offeror"* means each Person (other than a Permitted Transferee) who or that makes an Offer.

(ee)   *"Offer Period"* means the period ending thirty (30) days after the date on which an Offer Member gives an Offer Notice to the Company.

(ff)   *"Offered Interest"* means the Interest of an Offer Member to the extent such Interest is the subject of an Offer.

(gg).   *"Officer"* has the meaning set forth in Section 6.1(b).

(hh)   *"Other Member"* means, in the case of an Offer, each Member other than the Offer Member (as determined with respect to such Offer).

(ii)   *"Percentage"* means (1) for purposes of Section 8.3, the percentage determined by dividing the number of Units owned as of record by a Member by the total number of Units owned as of record by all Members, as determined immediately after an Offer Notice is given, and (2) in all other cases, the percentage determined by dividing the number of Units owned as of record by a Holder by the total number of Units owned as of record by all Holders, as determined immediately prior to the making of any distribution, allocation of Profit or Loss, or other event.

(jj)   *"Permitted Transferee"* means any Person acquiring an Interest (or any portion thereof or interest therein) from a Member (or a Successor treated as the Member) as a result of a Transfer in accordance with Section 8.2.

(kk)   *"Person"* means any natural person or legal person (including, but not limited to, a corporation, joint stock company, limited liability company, partnership, joint venture, association, estate, trust, government or governmental authority, agency or instrumentality) or any group of any of natural or legal persons acting in concert.

(ll)   *"Price"* means the amount, as mutually agreed by the Company and a Holder, to purchase or redeem an Interest (or any applicable portion thereof) of the Holder, or if the Company and the Holder cannot agree on such amount, the fair market value of the Interest (or any applicable portion thereof) as determined by an appraiser selected jointly by the Company and the Holder. If the Company and the Holder cannot agree on the identity of the appraiser, the Company and the Holder shall each select an appraiser who shall, in turn, mutually agree upon the selection of the appraiser to determine the amount. The appraisal shall take into account all appropriate discounts (including, without limitation, discounts for lack of control and lack of marketability). The Company and the Holder shall bear equally the cost of the appraisal, except that the Company and the Holder shall each bear the costs, if any, of the respective appraisers selected by each pursuant to the second sentence of this subsection.

(mm)   *"Profit"* or *"Loss"* means, for any Fiscal Year (or other specified period), the Company's taxable income or loss for such Fiscal Year (or other specified period), determined in accordance with Section 703(a) of the Code, which for this purpose shall include all items of income, gain, loss or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code, with the following adjustments;

MAR-26-2007 12:04PM    FROM-Elka Geller Nelson & Associates LLC    +    T-666  P.013/040  F-872

(1) any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing income or loss pursuant to this definition shall be added to such taxable income or loss;

(2) any expenditures of the Company described in Section 705(a)(2)(B) of the Code or treated as Section 705(a)(2)(B) expenditures pursuant to Treas. Reg. §1.704-1(b)(2)(iv)(b) (other than expenses in respect of which an election is properly made under Section 709 of the Code), and not otherwise taken into account in computing Profit or Loss pursuant to this definition shall be subtracted from such taxable income or loss;

(3) in the event the Gross Asset Value of any asset is adjusted pursuant to subparagraphs (2) or (4) of the definition of Section 1.1(s), the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profit or Loss;

(4) gain or loss resulting from any disposition of any asset with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the asset disposed of, notwithstanding the adjusted tax basis of such asset may differ from its Gross Asset Value;

(5) depreciation with respect to any asset shall be computed by reference to the adjusted Gross Asset Value of such asset, notwithstanding that the adjusted tax basis of such asset differs from its Gross Asset Value; and

(6) any income, gain, loss, expense or other item, to the extent specially allocated pursuant to Section 4.2, shall be excluded from the determination of such taxable income or loss.

(nn)    *"Remaining Interest"* means an Offered Interest if, and to the extent that, the Company elects not to exercise it rights to redeem the Offered Interest under Section 8.3(b).

(oo)    *"Reserves"* means, for any Fiscal Year (or other specified period), such cash amounts as the Managers may reserve from time to time for the payment of operating and capital expenses, contingent liabilities or other obligations or liabilities of the Company.

(pp)    *"Successor"* means any direct or indirect successor-in-interest to any Person, including, but not limited to, any Transferee, executor, administrator, trustee, guardian, heir, legatee, conservator, representative, custodian, fiduciary, attorney-in-fact or agent.

(qq)    *"Terminating Event"* means, with respect to a Person, the occurrence of any of the following: (1) death, liquidation, dissolution or other termination or cessation, (2) a Disability Event, or (3) a Bankruptcy Event.

(rr)    *"Transfer"* means, with respect to any Interest (or any portion thereof or interest therein), asset or property, any action or intended action to sell, exchange, barter, assign, transfer, give, or otherwise voluntarily or involuntarily dispose of, or any action or intended action to pledge, escrow, hypothecate, mortgage, grant or create a security interest in or lien

upon, or otherwise voluntarily or involuntarily encumber such Interest (or any portion thereof or interest therein), asset or property.

(ss)    *"Transferee"* means any Person who or that acquires, receives or owns an Interest (or any portion thereof or interest therein) as a result of a Transfer (including a Permitted Transferee).

(tt)    *"Transferor"* means any Person who or that made or makes a Transfer of an Interest (or any portion thereof or interest therein).

(uu)    *"Treas. Reg."* means any final, temporary or proposed regulation promulgated under the Code.

(vv)    *"Trust"* means a Person (other than a natural person) *if and so long as* (1) a Member making (or intending to make) a Transfer to such Person under Section 8.2, the current spouse of such Member, and/or one or more of such Member's children (irrespective of the age of such children) are the sole record and equitable owners or the sole record and equitable beneficiaries of such Person, and (2) such Person is prohibited from making a Transfer of an Interest (or any interest therein or any right, duty or obligation relating thereto, including but not limited to any Distribution Interest) to any Person other than such Member, a child over the age of twenty-one (21) years of such Member or the current spouse of such Member.

(ww)    *"Unit"* or *"Units"* means, with respect to a Holder, the allocation set forth in Schedule A hereto under the column heading "Allocation of Unit(s)" corresponding to such Holder, as such Schedule A may be amended or adjusted as provided herein.

(xx)    *"RK"* means, Robert Kroupa, an individual.

Section 1.2    <u>Conventions.</u>

Any reference to a specific section or other provision of a statute, code, regulation or similar legal authority (including, but not limited to, the Code or any Treas. Reg.) shall include any amendment thereof or successor thereto.

(a)    The titles and captions set forth in this Agreement are for convenience of reference only and do not in any way define or interpret the intent of the parties or modify or otherwise affect any of the provisions hereof and shall not affect the construction or interpretation of any provision hereof.

(b)    Whenever the context so requires, each pronoun or verb used herein shall be construed in the singular or the plural sense and each capitalized term defined herein and each pronoun used herein shall be construed in the masculine, feminine or neuter sense. The terms "herein," "hereto," "hereof," "hereby," and "hereunder," and other terms of similar import, refer to this Agreement as a whole, and not to any section or other part hereof.

## ARTICLE II

## FORMATION

**Section 2.1    Admission of Members.**  The Company was formed as a limited liability company upon the filing of the Certificate of Formation with the Secretary of State.  By executing this Agreement, each of the Persons listed on Schedule A is admitted as a Member having an Interest upon the terms and subject to the conditions set forth in this Agreement and applicable law.

**Section 2.2    Name of the Company.**  The name of the Company is GARBUS KROUPA ENTERTAINMENT, LLC.  The Company shall conduct its business under such name, or under any assumed, fictitious or other name permitted by law.  The Managers shall notify the Members of any change in the name of the Company or any other name used by the Company to conduct its business.

**Section 2.3    Place of Business.**  The principal place of business of the Company shall be initially located at c/o The Law Offices of Joseph R. Gagliano, Jr.  575 Madison Avenue, Suite 1006, New York, NY. 10022 , or at such other place as the Managers may determine. The Manager shall notify the Members of any change in the principal place of business of the Company.

**Section 2.4  Purpose.**  The purpose of the Company is to engage in the Business.

## ARTICLE III

## CAPITALIZATION

**Section 3.1    Capital Contributions.**

(a)    Each Member is contributing services described or cash or property with a net fair market value equal to the amount set forth opposite such Member's name on Schedule A hereto to the capital of the Company.

(b)    Except as expressly provided in this Agreement, no Holder shall be required to make any additional or other capital contribution to the Company, lend or advance funds or property to the Company or provide any services to the Company for any purpose whatsoever.  Except as otherwise provided in this Agreement, no Holder shall be permitted to make any additional or other capital contribution or to lend or advance funds or property to the Company.

**Section 3.2    Capital Accounts.**

(a)    A separate Capital Account shall be established and maintained for each Holder in accordance with Treas. Reg. §1.704-1(b) and this Agreement.  Except as otherwise

MAR-26-2007  12:04PM    FROM-Elka Geller Nelson & Associates LLC    +    T-866  P.016/040  F-372

provided herein, a Holder's Capital Account shall be equal to the cash and the fair market value of any property (net of any liabilities secured by such property that the Company is considered to assume or take subject to) initially contributed by such Holder to the capital of the Company pursuant to this Agreement, and shall be: (1) increased by (i) the amount of Profit allocable to such Holder and any income or gain specially allocated to such Holder, (ii) any cash and the fair market value of any property (net of any liabilities secured by such property that the Company is considered to assume or take subject to) hereafter contributed (or deemed contributed) to the capital of the Company by such Holder, and (iii) in the case of property distributed in kind, the amount of gain, if any, which would have been allocated to such Holder if the property had been sold by the Company for its fair market value on the date of distribution; and (2) decreased by (i) the amount of Loss allocable to such Holder and any losses or deductions specially allocated to such Holder, (ii) the amount of cash and the fair market value of any property (net of any liabilities secured by such property that such Holder is considered to assume or take subject to) distributed to such Holder, and (iii) in the case of property distributed in kind, the amount of loss, if any, that would have been allocated to such Holder if the property had been sold by the Company for its fair market value on the date of distribution. Except as otherwise provided herein, no addition to a Holder's Capital Account shall be made in respect of services rendered to the Company or contribution of intellectual property and proprietary information arising out of motion picture products and their development (other than any allocation of Profit under this Agreement arising after the receipt of the Holder's Interest).

(b)    In the event of a Transfer by a Holder of all or a part of such Holder's Interest in accordance with this Agreement, an appropriate portion of the Holder's Capital Account and Units shall be assigned to such Transferee (as well as the allocation and distribution history with respect to such Interest), each as determined by the Managers. The Managers shall have the power and authority to amend any schedule or exhibit to this Agreement to reflect, in a manner consistent with the preceding sentence, the Transfer of a Holder's Interest.

(c)    In the event that property contributed to the Company has a fair market value which differs from its basis (at the time of contribution) or an election is made by the Managers to adjust Capital Accounts to reflect a revaluation of Company property, income, gain, loss and deduction as computed for federal income tax purposes with respect to such property shall be allocated in the manner determined by the Manager, consistently applied, pursuant to Section 704(c) of the Code so as to take into account any variation between the Company's basis in the property and its fair market value on the date of the contribution, and the computation of Profit, Loss, any depreciation, amortization and gain or loss with respect to such property shall be based on such fair market value as adjusted.

(d)    The provisions of this Agreement are intended to comply with Treas. Reg. §1.704-1(b) and -2 and shall be interpreted and applied in a manner consistent with such regulations. The Managers may amend this Agreement (including, without limitation, to modify the manner in which Capital Accounts are maintained) in order to comply with such regulations (as they are currently in effect or may subsequently be amended).

Section 3.3    Other Matters Relating to Capital.

(a)    No Holder shall be entitled to withdraw or demand any part of such Holder's contribution to the capital of the Company.

(b)    No Holder shall be liable for the return of any other Holder's capital contribution to the Company; any such return of capital shall be made solely from the assets of the Company available therefor.

(c)    No interest shall accrue for the benefit of, or be paid to, any Holder on such Holder's contributions to the capital of the Company.

(d)    An Interest constitutes personal property. A Holder has no right to, interest in, or claim against any specific property of the Company by reason of the Holder's Interest.

## ARTICLE IV

### ALLOCATIONS AND DISTRIBUTIONS

Section 4.1    _Allocations of Profits and Losses_.  For each Fiscal Year of the Company, after adjusting each Member's Capital Account for all Capital Contributions and Distributions during such Fiscal Year and all special allocations pursuant to Section 4.2 with respect to such Fiscal Year, all Profits and Losses shall be allocated to the Members' Capital Accounts in a manner such that, as of the end of such Fiscal Year, the Capital Account of each Member (which may be either a positive or negative balance) shall be equal to (a) the amount that would be distributed to such Member, determined as if the Company were to liquidate all of its assets for the fair market value thereof and distribute the proceeds thereof pursuant to Section 4.2 hereof (assuming that the amount paid in satisfaction of each nonrecourse obligation of the Company is limited to the Book Value of the Company's assets securing that obligation), minus (b) the sum of (i) the amount, if any, which such Member is obligated to contribute to the capital of the Company as of the last day of such Fiscal Year, (ii) that Member's share of the Company's "partnership minimum gain" (as determined in accordance with Treasury Regulations Sections 1.704-2(d) and 1.704-2(g)), and (iii) that Member's share of the Company's "partnership nonrecourse debt minimum gain" (as determined in accordance with Treasury Regulations Section 1.704-2(i)).

Section 4.2    _Special Allocations_.

(a)    Notwithstanding the foregoing, if there is a net decrease in the Company minimum gain under Treas. Reg. §1.704-2(d) (with respect to "nonrecourse liabilities") or partner nonrecourse debt minimum gain under Treas. Reg. §1.704-2(i) (with respect to "partner nonrecourse debt") during a Fiscal Year, the Holders shall be allocated items of income and gain for such Fiscal Year (and if necessary for subsequent Fiscal Years) in the amounts and proportions determined pursuant to the provisions of Treas. Reg. §1.704-2(f) and (i)(4), respectively.  In addition, if a Holder unexpectedly receives any adjustments, allocations or distributions described in Treas. Reg. §1.704-1(b)(2)(ii)(d)(4), (5) or (6) which creates or increases a deficit in the Holder's Capital Account balance (as adjusted pursuant to such regulations), items of Company income (including gross income) and gain (consisting of a _pro_

MAR-26-2007 12:04PM   FROM-Elka Geller Nelson & Associates LLC        +          T-666  P.018/040  F-372

*rata* portion of each item of Company income and gain) shall be specially allocated to such Holder in an amount and manner sufficient to eliminate such deficit balance as quickly as possible pursuant to the provisions of Treas. Reg. §1.704-1(b)(2)(ii)(*d*). If at the end of any Fiscal Year (after taking into account all allocations as if this sentence and the prior sentence were not in the Agreement) a Holder has a deficit Capital Account balance (taking into account any deficit restoration obligation of such Holder, including any amount which such Holder is deemed to be obligated to restore pursuant to Treas. Reg. §1.704-2(g)(1) or (i)(5), and any adjustments pursuant to Treas. Reg. §1.704-1(b)(2)(ii)(*d*)(4), (5) or (6)), each such Holder shall be specially allocated items of Company income and gain in the amount of such deficit as quickly as possible. Except as otherwise provided in this Section 4.2(a), nonrecourse deductions within the meaning of Treas. Reg. §1.704-2(i) shall be allocated as provided therein. It is the intent of the Holders that any special allocations pursuant to this subsection shall be offset with other special allocations pursuant to this Section 4.2(a). Accordingly, special allocations of Company income, gain, loss or deduction shall be made in a manner so that, in the reasonable determination of the Managers, taking into account likely future allocations under this subsection, after such allocations are made, each Holder's Capital Account is, to the extent possible, equal to the Capital Account it would have had if this subsection were not part of the Agreement.

(b)    If the Company is required to recognize any interest income pursuant to Section 483 or Sections 1271 through 1288 of the Code in connection with any Holder's obligation to make a capital contribution, such interest income shall be specially allocated to such Holder and the amount of such interest income shall be excluded from the capital contributions credited to such Holder's Capital Account in connection with the payment of such obligation.

(c)    In the event that the Interests of the Holders vary during a Fiscal Year, the Profit, Loss, and except as otherwise required, any amount specially allocated pursuant to this Section 4.2 shall be allocated among the Holders under Section 706(d) of the Code in the manner determined by the Managers.

Section 4.3    Distributions.

(a)    The Company shall make distributions of Cash Flow at such times and in such amounts as the Managers in their sole discretion, may determine. Except in connection with the liquidation of the Company, any distribution shall be distributed to each Holder, *pro rata* in accordance with each Holder's Percentage.

(b)    A Holder may not receive a distribution from the Company (1) to the extent that, after giving effect to the distribution, all liabilities of the Company (other than to the Holders on account of their Interests and liabilities for which the recourse of creditors is limited to specified property of the Company) exceed the fair market value of the Company (except that property that is subject to a liability for which the recourse of the creditors is limited to such property shall be included only to the extent the fair market value of such property exceeds that liability), or (2) to the extent the distribution would create or increase a deficit balance in the Holder's Capital Account (taking into account any deficit restoration obligation such Holder is

# EXHIBIT A
# TO
# EXHIBIT 1
# (PART 2)

deemed to be obligated to restore pursuant to Treas. Reg. §1.704-2(g)(1) or (i)(5), and any adjustments pursuant to Treas. Reg. §1.704-1(b)(2)(ii)(*d*)(*4*), (*5*) or (*6*)).

Section 4.4    Amounts Withheld and Other Tax Payments.

(a)    Any amount withheld with respect to a Holder pursuant to any federal, state, local or foreign tax law from a distribution by the Company to a Holder shall be treated as distributed to such Holder under Section 4.3 or Section 9.2, as the case may be.

(b)    Any other amount required to be deposited or paid with respect to or on behalf of a Holder pursuant to any federal, state, local or foreign tax law in connection with any tax liability or obligation (estimated or otherwise) of the Holder shall be treated as a loan from the Company to such Holder. If such loan is not repaid within thirty (30) days from the date the Company notifies the Holder of such payment, the loan shall bear interest from the time such deposit or payment is made (and adjusted thereafter at intervals of one (1) year) at the prime rate in effect at The Chase Manhattan Bank, plus two (2) percentage points. In addition to all other remedies the Company may have, the Company may withhold distributions that would otherwise be payable to such Holder and apply such amounts toward repayment of the loan.

Section 4.5    Allocation of Nonrecourse Liabilities.    A Holder's share of the nonrecourse liabilities of the Company shall be allocated in accordance with Treas. Reg. §1.752-3(a), except that excess nonrecourse liabilities shall be allocated among the Holders in accordance with the manner in which the Managers reasonably expect that the nonrecourse deductions allocable to such liabilities will be allocated.

ARTICLE V

FISCAL MATTERS

Section 5.1    Tax Matters Partner.    JDG shall be the "tax matters partner" within the meaning of Section 6231(a)(7) of the Code.

Section 5.2    Tax Returns.    The Company shall prepare and file, or shall cause to be prepared and filed, all federal and any required state, local and foreign income and other tax returns for the Company.

Section 5.3    Elections.    Except as otherwise provided in this Agreement, all accounting decisions and elections required or permitted to be made by the Company under applicable law shall be made by the Managers, in their sole discretion.

Section 5.4    Books and Records.

MAR-26-2007 12:05PM    FROM-Elka Geller Nelson & Associates LLC    +    T-666  P.020/040  F-372

(a)    The Company shall maintain or cause to be maintained at its principal place of business complete and accurate books and records of the assets, business and affairs of the Company, including, without limitation:

(1)    true and full information regarding the status of the Business and financial condition of the Company;

(2)    a copy of the Company's federal, state and local income tax returns for each of the three (3) most recent Fiscal Years;

(3)    a current list of the name, last known business, residence or mailing address of each Holder;

(4)    a copy of this Agreement and the Company's Certificate of Formation and all amendments thereto and restatements thereof, together with an executed copy of any written power of attorney pursuant to which this Agreement and any certificate or amendment thereto has been executed; and

(5)    true and full information regarding the amount of cash and a description and statement of the agreed value of any property or services contributed by each Member and the date on which each became a Member.

(b)    The Managers shall have the power and authority to amend any schedule or exhibit to this Agreement to reflect the Transfer of a Holder's Interest in accordance with this Agreement, the occurrence of a Terminating Event with respect to a Holder or other event affecting the status of Interest of a Holder under this Agreement or the Act.

Section 5.5    Reports to Members.

(a)    As soon as practicable after the end of each Fiscal Year, the Company shall distribute:

(1)    to each Holder, a copy of the Holder's Schedule K-1 to the Partnership Tax Return (Form 1065); and

(2)    to each Member, a copy of the Company's unaudited financial statement, including a balance sheet as of the end of such Fiscal Year and an income statement for the Fiscal Year then ended, prepared in accordance with the Company's method of accounting.

(b)    Each Member may, upon reasonable notice to any of the Managers, for any purpose reasonably related to such Member's Interest, at such Member's own expense, inspect and copy, during the normal business hours of the Company, any records or information maintained by the Company.  Notwithstanding the foregoing, the Company may keep confidential from any Person, for such period as the Managers deem reasonable, any information which the Managers reasonably believe to be in the nature of trade secrets or other information the disclosure of which the Manager in good faith believe is not in the best interests of the

-14-

MAR-26-2007 12:05PM   FROM-Elka Geller Nelson & Associates LLC        +                    T-666  P.021/040  F-372

Company or could damage the Company or its Business, or which the Company is required by law or by agreement with a third party to keep confidential.

Section 5.6    Partnership Status.    The Holders intend that the Company be characterized as a partnership for United States federal tax purposes. No Holder, Manager or Officer shall make any election or take any other action if such election or other action would adversely affect such characterization.

ARTICLE VI

ADMINISTRATION AND MANAGEMENT

Section 6.1    Management.

(a)    Except as otherwise expressly provided in or limited by this Agreement, the Managers shall have the full right, power and authority to manage all of the business, assets, affairs and operations of the Company, with all rights and powers and the full authority necessary, desirable or convenient to administer and operate the same and to make all decisions and do all things necessary or desirable in connection therewith, including, but not limited to all duties, rights, powers and authority to:

(1)    negotiate, investigate, review, incur, assume, or enter into any contract, debt, loan, guarantee, mortgage, lease, sublease, license, employment or consulting arrangement or any other obligation or duty;

(2)    purchase, rent, lease, license or otherwise acquire (including, but not limited to, any mortgage, lien or other security interest) any real or personal property (or any interest therein);

(3)    sell, rent, lease, license or otherwise Transfer any or all of the real or personal property of the Company (or any interest therein);

(4)    hire or retain any employee, consultant, professional or other third party, including, but not limited to, any accountant, attorney, financial advisor, management consultant, broker, or property manager;

(5)    place or allow any lien, mortgage, security interest or other encumbrance to be placed against any property of the Company;

(6)    modify, settle or compromise any amount owed to or by the Company or any other contract, obligation or duty of or with the Company; or

(7)    conduct or settle any audit, administrative proceeding, lawsuit, claim or other similar proceeding or action.

(b)    The Managers may appoint, in a written instrument, such officers of the Company (each, an "*Officer*"), with such powers, duties and responsibilities as the Managers, in their sole discretion, may determine from time to time. The powers, duties and responsibilities

-15-

MAR-26-2007 12:05PM    FROM-Elka Geller Nelson & Associates LLC          +              T-666   P.022/040   F-372

of an Officer shall be set forth in the written instrument signed by the Managers approving the appointing of an Officer. At any time, the Managers may, in their sole discretion, revoke any appointment or modify, limit or amend the powers, duties or responsibilities of an Officer.

(c)    The affirmative vote or approval of each of the Managers shall be required to approve any action to be taken by or any matter required to be submitted to or brought before the Managers (prior to the appointment of more than one Person as an additional Manager) as provided herein. In the event of a stalemate or dispute between the Managers, the parties will attempt in good faith to resolve through negotiation any dispute, claim or controversy arising out of or relating to this Agreement. Either party may initiate negotiations by providing written notice in letter form to the other party, setting forth the subject of the dispute and the relief requested. The recipient of such notice will respond in writing within five days with a statement of its position on and recommended solution to the dispute. If the dispute is not resolved by this exchange of correspondence, then representatives of each party with full settlement authority will meet at a mutually agreeable time and place within ten days of the date of the initial notice in order to exchange relevant information and perspectives, and to attempt to resolve the dispute with the assistance of a third party to be agreed upon by the Managers. In the event the parties are unable to resolve the stalemate or dispute not withstanding third party assistance the matter shall be submitted to binding arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules. Any decision by the Arbitrators shall be binding and not appealable.

(d)    Except as otherwise provided in this Agreement, no Person (other than a Manager or Officer) shall have the authority to represent, bind or otherwise act on behalf of the Company.

(e)    No Manager or Officer shall have the authority to represent, bind or otherwise act on behalf of the Company except pursuant to an instruction or direction approved, authorized, consented to or ratified by the Managers or the Members, as the case may be, in accordance with this Agreement.

Section 6.2    Powers Reserved to the Members.

(a)    Except with the Consent of the Members or as otherwise provided herein, no Holder, Manager or Officer shall have any duty, right, power or authority to:

(1)    transfer all or substantially all of the Company's assets in a single transaction or series of related transactions;

(2)    terminate, merge, dissolve or liquidate the Company;

(3)    convert the Company to a corporation or other type of legal entity;

(4)    relocate the Company's principal place of business;

(5)    change the Fiscal Year;

(6)    change the name of the Company;

MAR-26-2007  12:05PM    FROM-Elka Geller Nelson & Associates LLC        +        T-666  P.023/040  F-372

(7)  issue any Units or Interest;

(8)  appoint or designate any Person as a Manager; or

(9)  amend, vary or modify any term or provision of this Agreement.

(b)  No amendment, variation, or modification of this Agreement shall be effective or valid if such amendment, variation or modification, contract alters a Holder's personal liability for any liability or obligation of the Company or the Holder's obligation to make capital contributions or loans to the Company or any distribution or allocation to which the Holder may be entitled under this Agreement or the Act, unless, in addition to any other Consent or other approval or action required by this Agreement, such Holder (regardless of whether such Holder is otherwise entitled to vote or participate in management under this Agreement) consents to such amendment, variation or modification.

Section 6.3    Effect of Terminating Event on a Manager.

(a)  A Person shall immediately terminate as and cease to be a Manager if:

(1)  a Terminating Event occurs with respect to the Person;

(2)  the Person delivers to Company a written resignation as a Manager; or

(3)  the Members, acting by Consent, terminate the Person's status as a Manager in such manner and on such terms and conditions as the Members may so determine.

(b)  If a Terminating Event occurs with respect to a Person who or that, immediately prior to such event, was a Manager, such Person (or such Person's Successor), within five (5) days of the Terminating Event, shall give to the Company written notice setting forth, in reasonable detail, the nature of the Terminating Event and the date on which the Terminating Event occurred.

(c)  The termination of a Person as a Manager shall not require any consent or other action on the part of the Company or the Members and shall be deemed to occur (1) immediately upon the occurrence of a Terminating Event with respect to the Person, (2) in the case of a written resignation, immediately after the end of the thirty (30) day period after the date on which the written resignation was given to the Company or (3) in the case of a termination by the Consent of the Members, on the date of the Consent or as otherwise provided under the terms of the Consent.

Section 6.4    Effect of a Terminating Event on Member/Holder.

(a)  A Holder admitted as a Member shall immediately terminate as and cease to be a Member if and when:

MAR-26-2007  12:05PM  FROM-Elka Geller Nelson & Associates LLC    +    T-666  P.024/040  F-372

(1)  a Terminating Event occurs with respect to such Holder; or

(2)  in the case of a Holder admitted as a Member on the grounds that such Holder qualified as a Permitted Transferee with respect to any other Person (whether or not the other Person continues to be a Holder), (i) the Holder ceases to be a Permitted Transferee with respect to the other Person (other than as a result of a Terminating Event) or (ii) a Bankruptcy Event occurs with respect to the other Person.

(b)    In the event,

(1)  a Terminating Event occurs with respect to a Holder; or

(2)  in the case of a Holder who or that acquired an Interest on the grounds that such Holder qualified as a Permitted Transferee with respect to any other Person (whether not the other Person continues to be a Holder), (i) the Holder ceases to be a Permitted Transferee with respect to the other Person (other than as a result of a Terminating Event) or (ii) a Bankruptcy Event occurs with respect to the other Person;

the Holder (or such Holder's Successor), within thirty (30) days of the occurrence of an event specified in Section 6.4(b)(1) or Section 6.4(b)(2), shall give to the Company written notice setting forth, in reasonable detail, the nature of the event described above, and the date on which the event occurred and the name, address and telephone number of such Holder (or such Holder's Successor, if any).

(c)    Beginning on the first date on which an event specified in Section 6.4(b) occurs with respect to a Holder, the Holder (or such Holder's Successor) shall have no Interest other than a Distribution Interest; *provided that* in the case of Holder who or that acquired an Interest on the grounds that such Holder qualified as a Permitted Transferee with respect to any other Person (whether or not such Person continues to be a Holder), such Holder shall only be entitled to those rights with respect to the Distribution Interest in the same manner and to the same extent that such other Person would have been entitled had such other Person not transferred the Interest to the Holder (including, but not limited to, any reduction in rights due to a breach of any term of this Agreement).    Notwithstanding any other provision of this Agreement, the occurrence of an event specified in Section 6.4(b) with respect to a Holder shall not release, terminate, alter or otherwise affect any duty, obligation or liability of the Holder arising prior to the occurrence of such event.

Section 6.5    Standard of Care.

(a)    In acting on behalf of the Company, a Covered Person shall act in good faith and with that degree of care that an ordinarily prudent Person in a like position would use under similar circumstances and shall perform diligently and faithfully the Covered Person's duties for the benefit of the Company in accordance with the Company's purposes, policies,

MAR-26-2007 12:05PM    FROM-Elka Geller Nelson & Associates LLC    +    T-666    P.025/040    F-372

procedures and objectives. A Covered Person shall devote such time and effort to such duties as the Covered Person deems necessary and appropriate.

(b)    In performing any duty, a Covered Person shall be entitled to rely on information, opinions, reports or statements, including financial statements and other financial data, in each case prepared or presented by:

(1)    one or more agents or employees of the Company;

(2)    counsel, public accountants, business, investment or financial consultants or advisors, or other Persons as to matters that such Covered Person believes to be within such Person's professional or expert competence; or

(3)    another Member, Manager or Officer duly designated in accordance with this Agreement, as to matters within designated authority of such Member, Manager or Officer which the Covered Person believes to merit confidence;

provided that in so relying, such Covered Person shall be acting in good faith and with such degree of care, but such Covered Person shall not be considered to be acting in good faith if such Covered Person has knowledge concerning the matter in question that would cause such reliance to be unwarranted.

(c)    A Covered Person performing such Covered Person's duties in accordance with this Section 6.5 and Section 6.6 shall have no liability by reason of being or having been a Covered Person or acting on behalf of the Company pursuant to the provisions and authority of this Agreement.

Section 6.6    Related Party Transactions.

(a)    Subject to the restrictions contained in this Agreement, a Holder, Manager or Officer may lend money to, guarantee or act as a surety for, provide collateral for an obligation of and transact other business with the Company and, subject to Section 6.6(b) and any applicable law, shall have the same rights and obligations with respect thereto as a Person who is not a Holder, Manager or Officer.

(b)    No contract or other transaction between or among the Company and a Holder, Manager or Officer, any Affiliate of a Holder, Manager or Officer or any other Person in, of or with which the Holder, Manager or Officer is a partner, creditor, stockholder, owner, member, manager, trustee, employee, director or officer, or otherwise has a substantial financial, economic, or contractual interest or relationship, shall be either void or voidable for this reason alone or by reason alone that the Holder, Manager or Officer is present at the meeting of the Members which approves such contract or transaction, or that the Holder's, Manager's or Officer's consent was given for such contract or transaction, if the material facts as to the Holder's, Manager's or Officer's interest in such contract or transaction and as to any such common financial, economic or contractual interest or relationship are disclosed in good faith or known to the Members, and the Members give Consent to such contract or transaction.

(c)    If, in accordance with Section 6.6(b), the material facts as to a Holder's, Manager's or Officer's interest in the contract or transaction and as to any such common financial, economic or contractual interest or relationship are disclosed in good faith or known to the Members and the Members give Consent to such contract or transaction, the contract or transaction may not be voided or avoided by the Company for the reasons set forth in Section 6.6(b). If there was no such disclosure or knowledge, the Company may void or avoid the contract or transaction, unless the party or parties thereto shall establish affirmatively that the contract or transaction was fair and reasonable as to the Company at the time it was approved by the Members.

(d)    Common or interested Members may be counted in determining the presence of a quorum at a meeting of the Members that Consent to such contract or transaction and may vote with respect to such matter or transaction.

Section 6.7    Limitation of Liability.    No Covered Person shall be liable to the Company or any Holder for any Damages suffered or incurred by any Person on account of, or by reason of any claim based on or arising from, any act taken or omitted to be taken in the course of representing or performing services for the Company or otherwise in the capacity as a Member, Manager or Officer, including, without limitation, the appointment or retention of, or reliance upon, any employee or agent of the Company or any Person referred to in Section 6.5(b), notwithstanding any negligence, fraud or willful misconduct by such employee, agent or Person; *except to the extent that* a judgment or other final adjudication (in each case which is not subject to appeal) adverse to the Covered Person establishes that (a) the acts of the Covered Person or omissions were in violation of any provision of this Agreement, or were in bad faith or involved intentional misconduct or a knowing violation of law, (b) such Covered Person, in fact, personally gained a financial profit or other advantage to which such Member, Manager or Officer was not legally entitled or (c) with respect to a distribution was made in violation of the Act, the acts of the Covered Person were not performed in accordance with this Agreement.

Section 6.8    Indemnification.    The Company shall indemnify each Covered Person and hold each Covered Person harmless from and against any Damages suffered or incurred by such Covered Person, as such, in the course of serving in any office of, or otherwise representing or acting for or on behalf of the Company (in each case within the scope of authority of the Covered Person), *except to the extent that* a judgment or other final adjudication (in each case which is not subject to appeal) adverse to such Covered Person establishes (a) that acts of the Covered Person were committed in bad faith or were the result of active and deliberate dishonesty and were material to the cause of action so adjudicated or (b) that the Covered Person personally gained in fact a financial profit or other advantage to which the Covered Person was not legally entitled; *provided that*, any other provision hereof, notwithstanding, any such indemnification shall be solely from the net assets of the Company, and no Member shall be required to make any capital contribution or otherwise pay any amount from such Member's own assets as a result thereof. The Company may procure insurance in such amounts and covering such risks as the Managers, in their sole discretion, determine to be appropriate to fund any indemnification required or permitted to be made hereunder. Upon making a claim for indemnification, a Covered Person, as applicable, may request in writing that the Company advance to such Covered Person the expenses of defending the claim, action, suit or proceeding giving rise to such indemnification claim and the Company shall advance such

MAR-26-2007 12:06PM   FROM-Elka Galler Nelson & Associates LLC          +                    T-666  P.027/040  F-372

expenses; *provided that* the Covered Person furnishes the Company with such assurances and security as may be reasonably requested by the Company to assure repayment of the amounts advanced by the Company in the event that a judgment or other final adjudication (in each case which is not subject to appeal) is rendered holding that such Covered Person was not entitled to be indemnified by the Company pursuant to this Agreement. Any such Covered Person shall agree to return to the Company amounts advanced by the Company in the event that a judgment or other final adjudication (in each case which is not subject to appeal) is rendered holding that such Covered Person is or was not entitled to be indemnified by the Company in accordance with this Agreement or applicable law.

Section 6.9   Bank Accounts.   The Company shall maintain one or more accounts (including, but not limited to, brokerage, custodial, checking, cash management and/or money market accounts) in such banks, brokerage houses or other financial institutions as the Managers may, in their sole discretion, determine. All amounts deposited by or on behalf of the Company in those accounts shall be and remain the property of the Company. All withdrawals from such accounts shall be made only by the Managers or an Officer authorized by the Managers. No funds of the Company shall be kept in any account other than a Company account, and funds of the Company shall not be commingled with the funds of any other Person; and no Member, Manager or Officer shall apply, or permit any other Person to apply, such funds in any manner, except for the benefit of the Company.

## ARTICLE VII

## MEETINGS AND VOTING

Section 7.1   Meetings of Members.

(a)   Except as provided herein, the Company shall not be required to hold any meeting of the Members. A meeting of the Members may be called, upon email or written notice of at least five (5) days, only by the Managers or the Members holding at least forty percent (40%) of the Units entitled to vote on an issue for which the meeting is called. Meetings shall be held at the office of the Company or at such other place which the Managers or the Members calling such meeting, as the case may be, shall reasonably designate in the notice of the meeting.

(b)   The presence of Members (in person or by proxy) owning at least eighty percent (80%) of the Units entitled to vote on the issue for which a meeting is called shall constitute a quorum at any meeting of Members. Once a quorum is present at a meeting, any action properly taken at the meeting remains valid and effective, notwithstanding the subsequent withdrawal of any Member from the meeting. If a quorum does not appear at a meeting, the Members present may adjourn the meeting, notwithstanding the absence of a quorum.

(c)   Whenever under this Agreement the Members are required or permitted to take any action by Consent, such action by Consent may be taken without a meeting, without prior notice and without a vote, if an instrument or instruments setting forth the action so taken shall be signed and dated by the Members holding the requisite number of Units necessary for Consent on the action, and such instrument or instruments are delivered by hand or by certified or registered mail, return receipt requested, to the office of the Company. Every such instrument

MAR-26-2007 12:06PM    FROM-Elka Geller Nelson & Associates LLC    +    T-666  P.028/040  F-372

shall bear the date of signature of each Member who signs such instrument, and no such instrument shall be effective to take the action referred to therein unless, within sixty (60) days of the earliest date such instrument is delivered in the manner required by this Section 7.1(c) to the Company, instruments signed by all of the required Members pursuant to this Section 7.1(c) are delivered to the office of the Company, its principal place of business or an Officer, employee or agent of the Company having custody of the records of the Company.

(d)     A Member who is either present at a meeting at which any action or approval on any matter is taken or sought, or who is absent but has notice of such action by certified mail, shall be presumed to have assented to the action taken unless the Member's dissent shall be entered in the minutes of the meeting or unless the Member has filed written dissent to such action with the Person acting as the secretary of the meeting before the adjournment thereof or shall forward such dissent by certified mail to the Members immediately after the adjournment of the meeting or within seven (7) days after written notification of such action by certified mail. The objection shall be deemed made when mailed by certified mail. Such right to dissent shall not apply to Members who voted in favor of such action.

Section 7.2    Participation in Meetings; Signing of Instruments.

(a)     A Member may appear and vote at a meeting in person or by proxy. Any proxy shall be dated and signed by the Member (or the Member's attorney-in-fact). A proxy shall remain effective for the period set forth therein. Any such proxy (other than a proxy coupled with an interest) may be revoked at any time, such revocation to be effective upon the presentation of a later-dated proxy or written notice of revocation given to the Company, or by the Member voting in person at the meeting.

(b)     A Member may participate in a meeting by means of a conference telephone or similar communication equipment by means of which all Persons participating in the meeting can hear each other simultaneously and such participation in a meeting shall constitute presence in person at such meeting.

(c)     Any instrument requiring the signature of a Member may be signed by the Member or by the Member's attorney-in-fact.

Section 7.3    Notice of Meeting.

(a)     At least three (3) business days' prior written notice shall be given stating the place, date and hour of the meeting, indicating that it is being issued by or at the direction of the Person or Persons calling the meeting and stating the purpose or purposes for which the meeting is called. An affidavit giving the notice certifying that the notice required by this Section 7.3 has been given from the Person or Persons shall, in the absence of fraud, be *prima facie* evidence of the facts therein stated. When a meeting is adjourned to another time or place, it shall not be necessary to give any notice of the adjourned meeting if the time and place to which the meeting is adjourned are announced at the meeting at which the adjournment is taken, and at the adjourned meeting any business may be transacted that might have been transacted on the original date of the meeting. Notwithstanding the foregoing, if a meeting of Members is adjourned because of a failure to obtain a quorum, written notice of the time and place of the

MAR-26-2007 12:06PM  FROM-Elka Geller Nelson & Associates LLC        +        T-666  P.026/040  F-372

adjourned meeting stating that the original meeting had to be adjourned due to the absence of a quorum shall be sent to each Member at least three (3) days before the date scheduled for the adjourned meeting.

(b)     Notice of a meeting need not be given to any Member who submits a signed waiver of notice, in person or by proxy, whether before or after the meeting.  The attendance of any Member at a meeting, in person or by proxy, without protesting prior to the conclusion of the meeting the lack of notice of such meeting, shall constitute a waiver of notice by such Member.

(c)     In the event the Consent of the Members is to be sought at a meeting of the Members with respect to any matter, the Managers shall provide to each Member all material information relevant to the evaluation and review of and giving of Consent with respect to such matter, at least five (5) business days prior to the meeting at which it is to be considered.  Any supplement or modification to or amendment or restatement of any matter previously approved by the Members under this Agreement (other than any immaterial supplement or change) shall be deemed to be a new matter requiring the same submission and approval of the Members as the original matter.

## ARTICLE VIII

## TRANSFERS

Section 8.1     Transfer Limitations.

(a)     Except as otherwise provided in this Agreement, no Holder may withdraw from the Company prior to the dissolution and winding up of the Company or Transfer all or any portion of any Interest (or any interest therein or any right, duty or obligation relating thereto, including but not limited to, any right to receive a distribution of Cash Flow or an allocation of Profit or Loss or participate in the management of the Company) without the prior written consent of the Managers, which consent may be withheld or granted in the sole discretion of the Managers.  Any attempt to Transfer an Interest (or any interest therein or any right, duty or obligation relating thereto, including but not limited to, any right to receive a distribution of Cash Flow or an allocation of Profit or Loss or participate in the management of the Company) or withdraw from the Company, in violation of this Agreement (including, but not limited to Section 8.1(b)), shall result, immediately upon such attempt, in the forfeiture for no consideration of the entire Interest held by the Holder attempting to make the Transfer or withdraw from the Company.  Any purported Transfer or withdrawal from the Company, in violation of this Agreement (including, but not limited to, Section 8.1(b)), shall be null and void *ab initio* and of no force or effect and shall not bind the Company.

(b)     Notwithstanding anything herein to the contrary set forth in this Agreement (including, without limitation, Section 8.2 or Section 8.3), a Transfer of an Interest (or any interest therein or any right, duty or obligation relating thereto, including but not limited to, any right to receive a distribution of Cash Flow, an allocation of Profit or Loss or participate in the management of the Company) shall not be permitted or made if (1) such Transfer would violate applicable securities, "blue sky" or similar laws, (2) such Transfer would cause the

-23-

# EXHIBIT A
# TO
# EXHIBIT 1
# (PART 3)

MAR-26-2007 12:06PM    FROM-Elka Geller Nelson & Associates LLC          +                    T-666   P.030/040   F-372

Company to be treated as a "publicly-traded partnership" within the meaning of Section 7704 of the Code, (3) such Transfer would require the Company to change from the cash receipts and disbursements method of accounting pursuant to Section 448 of the Code, or (4) at the time of a Transfer, the Transferee is a minor or is the subject of a Disability Event or a Bankruptcy Event.

(c)    A Transferee (including a Permitted Transferee) shall not be admitted as a Member unless and until the Transferee executes and delivers a counterpart of this Agreement, expressly assumes all of the obligations of the Transferor hereunder, and executes or delivers such other agreements, instruments, certificates, affidavits, opinions of counsel and other documents as the Managers may reasonably require in order to admit the Transferee as a Member in accordance with this Agreement and applicable law. Except as provided in the immediately preceding sentence, a Transferee (including a Permitted Transferee) shall not be a Member or otherwise be entitled to participate in the management and affairs of the Company, and a Transfer of an Interest (or any interest therein or any right, duty or obligation relating thereto, including but not limited to, any right to receive a distribution of Cash Flow or an allocation of Profit or Loss or participate in the management of the Company) shall not release, terminate, alter or otherwise affect any duty, obligation or liability of the Transferor.

(d)    Unless a Transferee is admitted as a Member in accordance with this Agreement, the only effect of a Transfer (including, but not limited to, a Transfer resulting from or relating to a Terminating Event) of an Interest in accordance with this Agreement is to entitle the Transferee to Distribution Interest, but only to the extent the Transferor would have been entitled to Distribution Interest as if the Transferor continued to own such Interest. Except as provided in the preceding sentence, a Transferee shall not have or be entitled to any other rights hereunder.

(e)    A Transfer of an Interest in accordance with the terms of this Agreement and applicable law shall not dissolve the Company.

Section 8.2    Permitted Transfers.

(a)    A Member may Transfer, in whole or in part, an Interest (including, but not limited to, a Distribution Interest) to:

(1)    a child or step-child over the age of twenty-one (21) years or the current spouse (including a significant other or life partner) of the Member;

(2)    a Trust;

(3)    an Affiliate of the Member *if and so long as* the Member owns all of the outstanding equity interests in the Affiliate and any and all options, warrants, conversion rights or similar arrangements to acquire any equity interest in the Affiliate; or

(4)    in the case of a Member that is not a natural person, any Person owning, at the time of Transfer, all of the outstanding equity interests of such Member;

MAR-26-2007 12:07PM   FROM-Elka Geller Nelson & Associates LLC       +       T-666  P.031/040  F-872

*provided that*, such Member, at the time such Transfer would otherwise be made in accordance with this Section 8.2, is not in breach of any obligation or duty under this Agreement, any related agreement or applicable law with respect to the Company.

(b)     Subject to Section 8.1, a Permitted Transferee shall be admitted as a Member without regard to the consent requirements of Section 8.1(a). Section 8.3 shall not apply to a Transfer under this Section 8.2 to a Permitted Transferee. Section 8.4 shall not apply to a Transfer under this Section 8.2 resulting from a Terminating Event (other than a Bankruptcy Event) to a Permitted Transferee described in Section 8.2(a)(4).

Section 8.3     Right of First Refusal.

(a)     Within ten (10) days of the receipt of an Offer, an Offer Member must give an Offer Notice to the Company. As soon as practicable after receipt of the Offer Notice, the Company shall provide a copy of the Offer Notice to each of the Other Members.

(b)     The Company, in the sole discretion of the Managers, may redeem all or a portion of the Offered Interest on the terms and conditions set forth in the Offer Notice (as appropriately adjusted in the case of a redemption of a portion of the Offered Interest); *provided that*, within the Offer Period, the Company gives an Acceptance Notice to the Offer Member. If the Company elects to redeem less than all of the Offered Interest pursuant to the preceding sentence, the Company shall provide to the Other Members within three (3) days after the close of the Offer Period written notice setting forth the manner and the extent to which the Company intends to exercise its rights to redeem the Offered Interest.

(c)     If, and to the extent that, the Company elects to redeem less than all of the Offered Interest in accordance with Section 8.3(b) above, each Other Member may purchase the Remaining Interest on the terms and conditions set forth in the Offer Notice (as appropriately adjusted in the case of a purchase of a portion of the Offered Interest); *provided that*, within twenty (20) days of the close of the Offer Period, the Other Member gives an Acceptance Notice to the Offer Member. Each Other Member shall have the right to purchase a percentage of the Remaining Interest equal to or less than the percentage determined by dividing the Other Member's Percentage (determined after taking into account the Company's exercise (or intended exercise) of its redemption rights under Section 8.3(b)) by the aggregate Percentages of all Other Members (determined after taking into account the Company's exercise (or intended exercise) of its redemption rights under Section 8.3(b)).

(d)     If, and to the extent that, the Other Members purchase less than all of the Remaining Interest in accordance with Section 8.3(c), then each Accepting Member may purchase the remaining portion of the Remaining Interest on the terms and conditions set forth in the Offer Notice (as appropriately adjusted in the case of a purchase of a portion of the Offered Interest); *provided that*, within thirty (30) days of the close of the Offer Period, the Accepting Member gives an Acceptance Notice to the Offer Member. Each Accepting Member shall purchase a percentage of the Remaining Interest equal to the percentage determined by dividing the Accepting Member's Percentage (determined after taking into account any redemptions or purchases (or intended purchases or redemptions) made or to be made under Section 8.3(b) or Section 8.3(c)) by the aggregate Percentages (determined after taking into account any

MAR-26-2007  12:07PM  FROM-Elka Geller Nelson & Associates LLC          +          T-666  P.032/040  F-372

redemptions or purchases (or intended purchases or redemptions) made or to be made under Section 8.3(b) or Section 8.3(c)) of all Accepting Members giving notice under the preceding sentence.

(e)    If the Company and the Other Members do not provide Acceptance Notices for all of the Offered Interest under Sections 8.3(b), 8.3(c) and 8.3(d), the rights and obligations of the Company and the Other Members, if any, to redeem or purchase the Offered Interest under this Section 8.3 shall terminate. The Offer Member shall be entitled to sell the Offered Interest without regard to the consent requirements set forth in Section 8.1(a)); *provided that* (1) such sale occurs within one-hundred twenty (120) days of the close of the Offer Period on the same terms and conditions as set forth in the Offer to the Offerors and (2) such sale would not directly or indirectly result in the breach of, and otherwise complies with, all other applicable provisions of this Agreement (including, but not limited to, Section 8.1(b)).

Section 8.4    Redemption of Interest upon a Terminating Event. If, as a result of an event described in Section 6.4(b)(1), a Holder (or a Holder's Successor) gives or is required to give written notice under Section 6.4(b), the Company, at the sole discretion of the Managers, shall have the right to redeem the Interest (or, as the Managers may determine, any portion thereof) held by such Holder (or such Holder's Successor) for an amount equal to the Price; *provided that* the Company gives written notice of its election to redeem such Interest (or such portion thereof) to such Holder (or such Holder's Successor) within two-hundred seventy (270) days of the later of the date on which written notice under Section 6.4(b) is given or, if the Holder (or such Holder's Successor) fails to give written notice under Section 6.4(b), the date on which any Manager has actual knowledge that the Holder (or such Holder's Successor) should have given notice under Section 6.4(b) and of the information required to be set forth in such notice. In the event the Company does not redeem all of the Interest pursuant to the preceding sentence, the Members, as the Members may mutually agree, shall have the right to purchase all or any portion of such Interest (to the extent not redeemed by the Company pursuant to the preceding sentence) subject to the same terms and conditions set forth in the preceding sentence, except that the notice period set forth in the preceding sentence shall be three-hundred sixty-five (365) days from the later of the two dates specified in the preceding sentence.

Section 8.5    Redemption of an Interest in case of a Permitted Transferee. If, as a result of an event described in Section 6.4(b)(2), a Holder (or such Holder's Successor) gives or is required to give written notice under Section 6.4(b), the Company, at the sole discretion of the Managers, shall have the right to redeem all (or, as the Managers may determine, any portion) of the Interest held by such Holder (or such Holder's Successor) for an amount equal to the Price, *provided that* the Company gives written notice of its election to redeem such Interest (or such portion thereof) to such Holder (or such Holder's Successor) within two-hundred seventy (270) days of the later of the date on which the written notice is given under Section 6.4(b) or, if the Holder (or such Holder's Successor) fails to give such written notice, the date on which any Manager has actual knowledge that the Holder (or such Holder's Successor) should have given notice under Section 6.4(b) and of the information required to be set forth in such notice. In the event the Company does not redeem all of a Holder's Interest pursuant to the preceding sentence, the Members, as the Members may mutually agree, shall have the right to purchase all or any portion of such Interest (to the extent not subject to the Company's election to redeem pursuant to the preceding sentence) subject to the same terms and conditions set forth in the preceding sentence.

MAR-26-2007 12:07PM    FROM-Elka Geller Nelson & Associates LLC          +          T-666  P.033/040  F-372

sentence, *except that* the notice period set forth in the preceding sentence shall be three-hundred sixty-five (365) days from the later of the two dates specified in the preceding sentence.

Section 8.6    Closing/Payment of Price.    A closing of any redemption or purchase of a Holder's Interest by the Company or an Other Member pursuant to Section 8.3 shall occur during regular business hours at the principal office of the Company on such date as the Holder and the Company or Other Member (as the case may be) agree, *provided that* such closing shall occur within sixty (60) days of the date on which an Acceptance Notice is given to the Holder by the Company or Other Member (as the case may be) under Section 8.3.

(a)    A closing of any redemption or purchase of a Holder's Interest by the Company or a Member pursuant to Section 8.4 or Section 8.5 shall occur during regular business hours at the principal offices of the Company (or other mutually-agreed location) on such date as the Company or other Member (as the case may be) may designate, *provided that* such closing shall occur within one hundred eighty (180) days of the written notice given by the Company under Section 8.4 or Section 8.5.

(b)    The Company or a Member purchasing an Interest pursuant to Section 8.4 or Section 8.5, at the option of the Managers or the Member (as the case may be), may make payment of the Price in a lump sum at closing or by paying up to twenty-five percent (25%) of the Price in cash at closing and by giving a Note for the balance of the Price.

Section 8.7    "Key Man" Insurance.    The Company may, in the discretion of the Managers, elect to maintain one or more insurance policy or policies on one or more of the Members for the purpose of providing for the purchase or redemption of all or a portion of a deceased Member's Interest.    In the event the Company receives the proceeds of such an insurance policy, the Managers shall use the proceeds first to prepay any Note given by the Company and then to pay any remaining portion of the Price.    Any excess insurance proceeds shall be retained by the Company.

## ARTICLE IX

## DISSOLUTION AND LIQUIDATION

Section 9.1    Dissolution.    The Company shall be dissolved upon the first of the following events to occur:

(a)    the determination of the Members by Consent;

(b)    the sale of all or substantially all of the assets of the Company; or

(c)    the entry of a judicial decree of dissolution of the Company pursuant to the Act.

Section 9.2    Liquidation.

MAR-26-2007 12:07PM   FROM-Elka Geller Nelson & Associates LLC        +        T-666   P.034/040   F-372

(a)     Upon a dissolution of the Company, the Liquidating Trustee shall take or cause to be taken a full account of the Company's assets and liabilities as of the date of such dissolution and shall proceed with reasonable promptness to liquidate the Company's assets and to terminate its Business and affairs. The Company's assets, or the proceeds from the liquidation thereof, shall be applied in cash or in kind in the following order:

(1) to creditors (including a Holder (other than on account of the Holder's Capital Account)) to the extent otherwise permitted by applicable law in satisfaction of all liabilities and obligations of the Company, including expenses of the liquidation (whether by the payment or making of reasonable provision for payment thereof), other than liabilities for which reasonable provision for payment has been made and liabilities for distribution to Holders and former Holders under Section 18-601 or 18-604 of the Act;

(2) to the establishment of such reserves for contingent liabilities of the Company as are deemed necessary or desirable by the Liquidating Trustee (other than liabilities for which reasonable provision for payment has been made and liabilities for distribution to Holders and former Holders under Section 18-601 or 18-604 of the Act); provided, however, that such reserves shall be held in a bank or other financial institution in escrow for the purpose of disbursing such reserves for the payment of such contingent liabilities and, at the expiration of such period as the Liquidating Trustee may reasonably deem advisable, for the purpose of distributing the remaining balance in accordance with subparagraphs (3) and (4) below;

(3) to Holders and former Holders in satisfaction of liabilities for distributions under Section 18-601 or 18-604 of the Act; and

(4) to the Holders, in accordance with Section 4.3 hereof.

(b)     The Liquidating Trustee shall be allowed a reasonable time for the orderly liquidation of the Company's assets and the discharge of indebtedness and other liabilities of the Company to creditors, so as to preserve and, upon disposition, maximize the value of the Company's assets.

(c)     Following the liquidation of the Company, the Liquidating Trustee shall file a Certificate of Cancellation of the Certificate of Formation of the Company with the Office of the Secretary of State of the State of Delaware.

Section 9.3   _Fiscal Year of Termination_. Upon the liquidation of the Company (or any Holder's Interest) within the meaning of Treas. Reg. §1.704-1(b)(2)(ii)(g), the liquidating distributions shall be made on or before the close of the Fiscal Year in which the liquidation occurs, and, in any event, within ninety (90) days after the date of such liquidation. In the case of the liquidation of the Company, such distribution may be made to a trust established for the benefit of the Holders for purposes of liquidating assets, collecting amounts owed, paying any indebtedness and other liabilities and distributing the remaining amounts to the Holders in the same amounts as would have been distributed by the Company without regard to the trust.

Section 9.4   _Continuing Liabilities and Other Obligations_. Except as otherwise expressly provided herein, no reconstitution, dissolution, liquidation or termination of the

-28-

Company shall relieve, release or otherwise discharge any Holder, or any of that Holder's successors, assigns, heirs or legal representatives, from any previous breach or default of, or any obligation or other liability theretofore incurred or accrued under, or any provision of this Agreement or applicable law, and any and all liabilities, claims, demands or causes of action arising from any such breaches, defaults, obligations and liabilities shall survive any such reconstitution, dissolution, liquidation or termination.

Section 9.5  Dissolution Financial Statement.  As soon as practicable after the dissolution of the Company, the Liquidating Trustee shall cause a statement of the Company's assets and liabilities as of the date of such dissolution to be prepared and furnished to the Holders.

## ARTICLE X

## MISCELLANEOUS

Section 10.1  Limitation of Authority.  Except as expressly provided herein, no provision hereof shall be deemed to create any partnership, joint venture, joint enterprise or association among the parties hereto, or to authorize or to empower any party hereto to act on behalf of, obligate or bind any other party hereto.

Section 10.2  Fees and Expenses.  All fees and expenses, including, without limitation, attorneys' fees and expenses, of the Company incurred in connection with this Agreement shall be borne by the Company.

Section 10.3  Notices.  All notices and other communications required or permitted to be given pursuant to this Agreement shall be in writing signed by the sender, and shall be considered given by the sender and received by the recipient as follows: (a) on the date delivered, if personally delivered; (b) on the date sent by telecopy, if sent on a business day by 6:00 p.m. (EST) with automatic confirmation by the transmitting machine showing the proper number of pages were transmitted without error; or if sent after that time, on the next succeeding business day; (c) on the next business day after being sent by recognized overnight mail service in time for and specifying next day or next business day delivery; or (d) five (5) business days after mailing, if mailed by United States postage-paid, certified or registered mail, return receipt requested, in each case addressed to the parties at their respective addresses or telecopier numbers as set forth on the books and records of the Company.

Section 10.4  Waiver.  No course of dealing or omission or delay on the part of any party hereto in asserting or exercising any right hereunder shall constitute or operate as a waiver of any such right. No waiver of any provision hereof shall be effective, unless in writing and signed by or on behalf of the party to be charged therewith. No waiver shall be deemed a continuing waiver or waiver in respect of any other or subsequent breach or default, unless expressly so stated in writing.

Section 10.5  Governing Law.  This Agreement shall be governed by, interpreted, construed and enforced in accordance with the laws of the State of Illinois, without

MAR-26-2007  12:07PM   FROM-Elka Geller Nelson & Associates LLC        +           T-666  P.036/040  F-372

regard to choice or conflict of laws principles that would defer to the substantive laws of any other jurisdiction.

Section 10.6  _Remedies._  In the event of any actual or prospective breach or default by any party, the other parties shall be entitled to equitable relief, including, without limitation, remedies in the nature of injunction and specific performance (without being required to post a bond or other security or to establish any actual damages).  In this regard, the parties acknowledge that they will be irreparably damaged in the event this Agreement is not specifically enforced.  All remedies hereunder are cumulative and not exclusive, and nothing herein shall be deemed to prohibit or limit any party from pursuing any other remedy or relief available at law or in equity for any actual or prospective breach or default, including, without limitation, the recovery of damages.

Section 10.7  _Severability._  The provisions hereof are severable and in the event that any provision of this Agreement shall be determined to be invalid or unenforceable in any respect by a court of competent jurisdiction, the remaining provisions hereof shall not be affected, but shall, subject to the discretion of such court, remain in full force and effect, and any invalid or unenforceable provision shall be deemed, without further action on the part of the parties hereto, amended and limited to the extent necessary to render such provision, as so amended and limited, valid and enforceable.

Section 10.8  _Counterparts._  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.

Section 10.9  _Further Assurances._  Each party hereto shall promptly execute, deliver, file or record such agreements, instruments, certificates and other documents and take such other actions as the Managers may reasonably request or as may otherwise be necessary or proper to carry out the terms and provisions of this Agreement and to consummate and perfect the transactions contemplated hereby.

Section 10.10  _Binding Effect._  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective legal representatives, successors and permitted assigns.  This Agreement is not intended, and shall not be deemed, to create or confer any right or interest for the benefit of any Person not a party hereto.

Section 10.11  _Assignment._  Except as otherwise expressly provided herein, neither this Agreement nor any right, interest or obligation hereunder may be assigned by any party without the prior written consent of each other party hereto.  Any purported assignment in violation of this Agreement shall be null and void _ab initio_ and without effect.

Section 10.12  _Construction._  This Agreement shall not be construed against the Company or any party by reason of its having caused this Agreement to be drafted.

Section 10.13  _Entire Agreement._  This Agreement, together with that certain letter agreement by RK to JDG dated as of December 1, 2005 constitutes the entire understanding and agreement among the parties hereto with respect to the subject matter hereof

and supersedes all prior and/contemporaneous agreements (whether written or oral) relating thereto, all of which are merged herein.

### Section 10.14 Certain Agreements between JDG and RK.

(a)    RK agrees that any motion picture project, property or transaction that has been developed by JDG and introduced to RK shall only be further developed by the Company and not by RK individually, directly or indirectly. RK agrees and acknowledges the great value JDG brings to the Company and RK by introducing to them motion picture projects that he has developed, is developing and will develop. JDG and RK acknowledge and agree that RK has the sole and exclusive first option to fund any motion picture project, property or transaction or similar type media project, property or transaction introduced by JDG.    Such option is exercisable by RK 10 (ten) days after introduction by JDG. JDG's introduction shall provide a summary of the plot, the budget therefore and any talent attached thereto.. After the ten (10) day period provided for herein, RK's option for the specific motion picture project introduced therein shall expire.

(b)    The five percent (5%) "Financing Fee" payable by the entity owning any motion picture shall be the sole and exclusive property of JDG.

(c) Notwithstanding any provision aforesaid, JDG, agrees to continue to provide executive producer services with respect to any motion picture project for a minimum of two years following the date of the financing of such motion picture.

IN WITNESS WHEREOF, the Members have duly executed and delivered this Agreement as of the date first above written.

_____
ROBERT KROUPA


_____
JAMES D. GARBUS

Mar 29 07 10:11a    James D. Garbus, Esq.        12127349172              p.2
Jan 04 06 06:30p    ROBERT KROUPA                                        p.1

        Jan 03 06 07:04p    James D. Garbus, Esq.        12127349172      p.1

and supersedes all prior and/contemporaneous agreements (whether written or oral) relating thereto, all of which are merged herein.

## Section 10.14 Certain Agreements between JDG and RK.

(a)    RK agrees that any motion picture project, property or transaction that has been developed by JDG and introduced to RK shall only be further developed by the Company and not by RK individually, directly or indirectly. RK agrees and acknowledges the great value JDG brings to the Company and RK by introducing to them motion picture projects that he has developed, is developing and will develop. JDG and RK acknowledge and agree that RK has the sole and exclusive first option to fund any motion picture project, property or transaction or similar type media project, property or transaction introduced by JDG. Such option is exercisable by RK 10 (ten) days after introduction by JDG. JDG's introduction shall provide a summary of the plot, the budget therefore and any talent attached thereto.. After the ten (10) day period provided for herein, RK's option for the specific motion picture project introduced therein shall expire.

(b)    The five percent (5%) "Financing Fee" payable by the entity owning any motion picture shall be the sole and exclusive property of JDG.

(c) Notwithstanding any provision aforesaid, JDG agrees to continue to provide executive producer services with respect to any motion picture project for a minimum of two years following the date of the financing of such motion picture.

IN WITNESS WHEREOF, the Members have duly executed and delivered this Agreement as of the date first above written.

ROBERT KROUPA

JAMES D. GARBUS

-31-

Jan 03 2006 5:34PM    450 Brier LLC

p.2        773-871-2488        450 Brier LLC    5:34PM 2006 03 Jan

# EXHIBIT A
# TO
# EXHIBIT 1
# (PART 4)

MAR-26-2007  12:08PM   FROM-Elka Geller Nelson & Associates LLC                     +                                    T-668   P.038/040   F-372

## SCHEDULE A

| Name and Address | Member | Capital Contribution | Allocation of Unit(s) |
|---|---|---|---|
| Robert Kroupa<br>654 West Hutchinson Street<br>Chicago, Illinois 60613 | Y | [$1,312,500] | 60% |
| James D. Garbus<br>315 E.72nd Street<br>Apt 12-M<br>New York, New York 10021 | Y | [Contribution of Intellectual Property and Proprietary Information Arising out of Motion Picture Products and their Development] | 40% |

-i-

MAR-26-2007  12:08PM    FROM-Elka Geller Nelson & Associates LLC         +                    T-666   P.038/040   F-372

# TABLE OF CONTENTS

**PAGE**

ARTICLE I DEFINITIONS .................................................................................................2

    Section 1.1  Certain Defined Terms.................................................................8

    Section 1.2  Conventions. ..............................................................................9

ARTICLE II FORMATION .............................................................................................9

    Section 2.1  Admission of Members...............................................................9

    Section 2.2  Name of the Company ................................................................9

    Section 2.3  Place of Business .......................................................................9

    Section 2.4  Purpose.....................................................................................9

ARTICLE III CAPITALIZATION....................................................................................9

    Section 3.1  Capital Contributions.................................................................9

    Section 3.2  Capital Accounts.......................................................................10

    Section 3.3  Other Matters Relating to Capital..............................................11

ARTICLE IV ALLOCATIONS AND DISTRIBUTIONS .................................................11

    Section 4.1  Allocations of Profits and Losses ...............................................11

    Section 4.2  Special Allocations....................................................................12

    Section 4.3  Distributions..............................................................................13

    Section 4.4  Amounts Withheld and Other Tax Payments. ..............................13

    Section 4.5  Allocation of Nonrecourse Liabilities.........................................13

ARTICLE V FISCAL MATTERS ...................................................................................13

    Section 5.1  Tax Matters Partner...................................................................13

    Section 5.2  Tax Returns ...............................................................................13

    Section 5.3  Elections....................................................................................13

    Section 5.4  Books and Records. ...................................................................14

    Section 5.5  Reports to Members...................................................................15

    Section 5.6  Partnership Status......................................................................15

ARTICLE VI ADMINISTRATION AND MANAGEMENT .............................................15

    Section 6.1  Management...............................................................................16

    Section 6.2  Powers Reserved to the Members...............................................17

    Section 6.3  Effect of Terminating Event on a Manager. .................................17

    Section 6.4  Effect of a Terminating Event on Member/Holder.......................18

    Section 6.5  Standard of Care. .......................................................................19

    Section 6.6  Related Party Transactions. ........................................................

MAR-26-2007  12:08PM    FROM-Elka Geller Nelson & Associates LLC         +         T-666   P.040/040  F-372

Section 6.7  Limitation of Liability.................................................................20
Section 6.8  Indemnification .......................................................................21
Section 6.9  Bank Accounts .......................................................................21

ARTICLE VII  MEETINGS AND VOTING.................................................21

Section 7.1  Meetings of Members. ............................................................22
Section 7.2  Participation in Meetings; Signing of Instruments. ...................22
Section 7.3  Notice of Meeting. ..................................................................23

ARTICLE VIII  TRANSFERS .....................................................................23

Section 8.1  Transfer Limitations................................................................24
Section 8.2  Permitted Transfers. ...............................................................25
Section 8.3  Right of First Refusal..............................................................26
Section 8.4  Redemption of Interest upon a Terminating Event.....................26
Section 8.5  Redemption of an Interest in case of a Permitted Transferee ......27
Section 8.6  Closing/Payment of Price .......................................................27
Section 8.7  "Key Man" Insurance..............................................................27

ARTICLE IX  DISSOLUTION AND LIQUIDATION ..................................27

Section 9.1  Dissolution ............................................................................27
Section 9.2  Liquidation.............................................................................28
Section 9.3  Fiscal Year of Termination ......................................................28
Section 9.4  Continuing Liabilities and Other Obligations.............................29
Section 9.5  Dissolution Financial Statement ...............................................29

ARTICLE X  MISCELLANEOUS .................................................................29

Section 10.1  Limitation of Authority...........................................................29
Section 10.2  Fees and Expenses ...............................................................29
Section 10.3  Notices ................................................................................29
Section 10.4  Waiver.................................................................................29
Section 10.5  Governing Law .....................................................................30
Section 10.6  Remedies..............................................................................30
Section 10.7  Severability ..........................................................................30
Section 10.8  Counterparts.........................................................................30
Section 10.9  Further Assurances................................................................30
Section 10.10  Binding Effect .....................................................................30
Section 10.11  Assignment .........................................................................30
Section 10.12  Construction........................................................................30
Section 10.13  Entire Agreement.................................................................
Error! Bookmark not defined.

Jan '03 06 07:04p    James D. Garbus, Esq.    12127349172    p.1

and supersedes all prior and/contemporaneous agreements (whether written or oral) relating thereto, all of which are merged herein.

Section 10.14 Certain Agreements between JDG and RK.

(a) RK agrees that any motion picture project, property or transaction that has been developed by JDG and introduced to RK shall only be further developed by the Company and not by RK individually, directly or indirectly. RK agrees and acknowledges the great value JDG brings to the Company and RK by introducing to them motion picture projects that he has developed, is developing and will develop. JDG and RK acknowledge and agree that RK has the sole and exclusive first option to fund any motion picture project, property or transaction or similar type media project, property or transaction introduced by JDG. Such option is exercisable by RK 10 (ten) days after introduction by JDG. JDG's introduction shall provide a summary of the plot, the budget therefore and any talent attached thereto.. After the ten (10) day period provided for herein, RK's option for the specific motion picture project introduced therein shall expire.

(b) The five percent (5%) "Financing Fee" payable by the entity owning any motion picture shall be the sole and exclusive property of JDG.

(c) Notwithstanding any provision aforesaid, JDG, agrees to continue to provide executive producer services with respect to any motion picture project for a minimum of two years following the date of the financing of such motion picture.

IN WITNESS WHEREOF, the Members have duly executed and delivered this Agreement as of the date first above written.

ROBERT KROUPA

JAMES D. GARBUS

-31-

Jan 03 2006 6:34PM    450 Brian LLC    773-871-2488    p.2

Stephen Novack
Stephen J. Siegel
Molly S. DiRago
NOVACK AND MACEY LLP
100 North Riverside Plaza
Chicago, Illinois 60606
(312) 419-6900
Attorney No. 91731
210914v1

18

# EXHIBIT 2

American Arbitration Association.
*Dispute Resolution Services Worldwide*

## COMMERCIAL ARBITRATION RULES
### DEMAND FOR ARBITRATION

| | | | | |
|---|---|---|---|---|
| **MEDIATION:** *If you would like the AAA to contact the other parties and attempt to arrange a mediation, please check this box.* ☐ *There is no additional administrative fee for this service.* | | | | |

| | | |
|---|---|---|
| Name of Respondent <br> James D. Garbus | | Name of Representative (if known) |
| Address <br> 315 East 72nd Street, Apt. 12L-M | | Name of Firm (if applicable) |
| | | Representative's Address |

| City <br> New York | State <br> NY | Zip Code <br> 10021- | City | State | Zip Code |
|---|---|---|---|---|---|
| Phone No. | | Fax No. | Phone No. | | Fax No. |
| Email Address: | | | Email Address: | | |

The named claimant, a party to an arbitration agreement dated December 14, 2005 _____, which provides for arbitration under the Commercial Arbitration Rules of the American Arbitration Association, hereby demands arbitration.

THE NATURE OF THE DISPUTE

See Exhibit A.

| | |
|---|---|
| Dollar Amount of Claim $2,000,000.00 | Other Relief Sought: ☒ Attorneys Fees  ☒ Interest <br> ☒ Arbitration Costs ☒ Punitive/ Exemplary ☐ Other _____ |

AMOUNT OF FILING FEE ENCLOSED WITH THIS DEMAND (please refer to the fee schedule in the rules for the appropriate fee) $8,000.00

PLEASE DESCRIBE APPROPRIATE QUALIFICATIONS FOR ARBITRATOR(S) TO BE APPOINTED TO HEAR THIS DISPUTE:
Experience in complex commercial disputes.

Hearing locale Chicago, Illinois _____ (check one) ☒ Requested by Claimant  ☐ Locale provision included in the contract

| | |
|---|---|
| Estimated time needed for hearings overall: <br><br> _____ hours or 3 _____ days | Type of Business: Claimant ___Real estate investment___ <br><br> Respondent Attorney/film development _____ |

Is this a dispute between a business and a consumer? ☐Yes ☒ No Does this dispute arise out of an employment relationship? ☐ Yes ☒No

If this dispute arises out of an employment relationship, what was/is the employee's annual wage range? Note: This question is required by California law. ☐Less than $100,000 ☐ $100,000 - $250,000 ☐ Over $250,000

You are hereby notified that copies of our arbitration agreement and this demand are being filed with the American Arbitration Association's Case Management Center, located in (check one)  ☐ Atlanta, GA  ☒ Dallas, TX   ☐ East Providence, RI
☐ Fresno, CA  ☐ International Centre, NY, with a request that it commence administration of the arbitration.  Under the rules, you may file an answering statement within fifteen days after notice from the AAA.

| | |
|---|---|
| Signature (may be signed by a representative)   Date: <br> [signature]    4-8-08 | Name of Representative <br> Stephen Novack |
| Name of Claimant <br> Robert Kroupa | Name of Firm (if applicable) <br> Novack and Macey LLP |
| Address (to be used in connection with this case) <br> 645 W. Hutchinson | Representative's Address <br> 100 N. Riverside Plaza |

| City <br> Chicago | State <br> IL | Zip Code <br> 60657- | City <br> Chicago | State <br> IL | Zip Code <br> 60606- |
|---|---|---|---|---|---|
| Phone No. | | Fax No. | Phone No. <br> 312-419-6900 | | Fax No. <br> 312-419-6928 |
| Email Address: | | | Email Address: <br> snovack@novackmacey.com | | |

To begin proceedings, please send two copies of this Demand and the Arbitration Agreement, along with the filing fee as provided for in the Rules, to the AAA.  Send the original Demand to the Respondent.
Please visit our website at www.adr.org if you would like to file this case online.  AAA Customer Service can be reached at 800-778-7879

## EXHIBIT A

## NATURE OF ACTION

1.    In late 2005, Claimant Robert Kroupa ("Kroupa") and Respondent James D. Garbus ("Garbus") formed Garbus Kroupa Entertainment, LLC ("GKE"), a Delaware limited liability company ("LLC"). Kroupa brings this arbitration both individually and derivatively on behalf of GKE. Kroupa seeks remedies for Garbus' multiple, flagrant breaches of his contractual and fiduciary duties. These remedies include money damages, inspection of GKE records, an accounting and an arbitral order removing Garbus as a manager of GKE. In addition, Kroupa seeks certain declaratory relief relating to a critical term of his agreement with Garbus.

2.    Kroupa has contemporaneously filed a complaint against Garbus in the Circuit Court of Cook County, Illinois, Chancery Division, Case No. 08 CH 13020 (the "Related Litigation"). This arbitration is filed in the event that the court in the Related Litigation declines to hear one or more of the claims pleaded herein.

## PARTIES

3.    Kroupa is an individual residing in Chicago, Illinois. Kroupa is one of the two Managers, and one of the two members, of GKE.

4.    GKE is a Delaware limited liability company with its principal office in New York, New York.

5.    Garbus is an individual residing outside of the State of Illinois. Garbus is the other Manager, and the other member, of GKE.

## GENERAL ALLEGATIONS

6.      Several years ago, Kroupa was introduced to Garbus, a New York attorney who claimed to have contacts and experience in the film industry. Kroupa, too, was interested in the film industry, but had no prior experience with film investing, development or production.

### Oral Agreement

7.      In December 2005, Kroupa and Garbus agreed to form a business partnership for the purpose of developing a motion picture tentatively titled "Save Me." Kroupa and Garbus met at a restaurant in New York City in early December, 2005. Later that month, they spoke on one or more occasions by telephone. In the meeting and telephone conversation(s), Kroupa and Garbus discussed and agreed to form and operate a partnership to develop "Save Me," and to various terms of their agreement.

8.      Among other things, Garbus and Kroupa agreed, and had a meeting of the minds, that Kroupa would contribute certain cash to "Save Me," while Garbus would oversee the project to ensure that the film was produced and distributed and that Kroupa's cash investment was properly preserved and protected. Kroupa agreed to invest approximately $1.3 million in "Save Me," subject to various terms and conditions.

9.      In the same meeting and conversation(s), Garbus expressly agreed that Kroupa would be entitled to recoup an amount equal to his cash investment, plus a 20% return thereon, before any profits, cash flow, or other distributions were provided to Garbus (hereafter, the "120% Return Provision"). The parties agreed that after (but only after) Kroupa received 120% of his investment, profits would be distributed on a 60/40 basis, i.e., Kroupa would receive 60% of every such distribution and Garbus 40%.

2

10.  In a telephone conversation in or around December 2005, Garbus and Kroupa further agreed to form an LLC, i.e., GKE, and that each of them would be managers of GKE.

11.  The foregoing oral agreement, including the 120% Return Provision, was, and is, a valid and enforceable agreement.

### Written GKE Agreement

12.  The parties undertook to memorialize the foregoing agreement in writing. In or around December, 2005, attorney Garbus drafted what ultimately became the Garbus Kroupa Entertainment Limited Liability Company Agreement (the "Written GKE Agreement"), an executed copy of which is attached as Exhibit 1 to this Demand.

13.  Kroupa asked his long-time Chicago real estate attorney, Elka Geller Nelson ("Nelson"), to review the draft Written GKE Agreement that Garbus had prepared.

14.  In telephone conversations held in or around December, 2005, Garbus advised and represented to Nelson that he and Kroupa had agreed to the 120% Return Provision as a part of their deal and that such Provision was contained in a side letter agreement between Kroupa and him. Consistent therewith, Section 10.3 of the Written GKE Agreement expressly provides that the parties' entire agreement includes a letter agreement between Kroupa and Garbus.

15.  However, contrary to what Garbus told Nelson, and unbeknownst to Nelson, the letter agreement referred to in the Written GKE Agreement does not contain the 120% Return Provision.

16.  Thus, Garbus either intentionally or mistakenly omitted the 120% Return Provision from the Written GKE Agreement, and the Written GKE Agreement did not fully and accurately reflect the earlier oral agreement between Kroupa and Garbus described in paragraphs 7 through 11 above.

3

17.     It was unknown to Kroupa when he signed the Written GKE Agreement that it did not expressly recite the parties' earlier oral agreement to the 120% Return Provision. In fact, Kroupa first learned that the Written GKE Agreement did not expressly recite the 120% Return Provision in or around the summer of 2007.

18.     The Written GKE Agreement includes various terms and conditions governing Garbus' conduct as a Manager of GKE, including, but not limited to, those outlined immediately below.

19.     Section 1.1(x) identifies Garbus and Kroupa as the Managers of GKE.

20.     Section 3.1(a) provides that Kroupa was contributing to GKE certain specified cash and Garbus was contributing "Intellectual Property and Proprietary Information Arising out of Motion Picture Products and their Development."

21.     Section 10.14(c) requires Garbus "to continue to provide executive producer services with respect to any motion picture project for a minimum of two years following the date of the financing of such motion picture."

22.     Sections 3.1(a) and 3.2(a) provide, however, that Garbus' capital account will not be credited "in respect of services rendered to the Company or contribution of intellectual property and proprietary information arising out of motion picture products and their development . . . other than any allocation of Profit under this Agreement[.]"

23.     Article V requires GKE to maintain "complete and accurate books and records" at its principal offices in New York, to allow any member to inspect and copy same, and to provide each member with, among other things, a balance sheet and income statement each year.

4

24.     Under Section 6.1, the approval of both Managers was required for GKE to, among other things, enter into contracts and acquire interests in movies.

25.     Section 6.2(b) addresses amendments to the Written GKE Agreement, but does not require that amendments be in writing or signed.

26.     Section 6.5(a) provides that a Manager "shall act in good faith and with that degree of care that an ordinarily prudent Person in a like position would use under similar circumstances and shall perform diligently and faithfully [his] duties for the benefit of the Company[.]"

**GKE Projects**

27.     At various points after the written GKE Agreement was signed, Garbus reiterated the 120% Return Provision to Kroupa (and others) and that it was binding between Kroupa and him.

28.     Kroupa relied on the foregoing statements, without limitation, by investing additional cash in GKE entertainment projects after making his initial approximately $1.3 million investment in "Save Me."

29.     In that regard, among other things, Kroupa contributed an additional approximately $9 million to GKE to fund all or part of four other entertainment projects, namely, films tentatively titled "Dream Boy," "Brooklyn To Manhattan" and "Latin Lyrics," and a recorded stage production titled "Bobby Jones Comedy All Stars: Volume 1."

30.     In the event the court in the Related Litigation does not order reformation of the Written GKE Agreement to include the 120% Return Provision, then Kroupa seeks an arbitral finding that, by reason of the conduct alleged in paragraphs 27 through 29 above, without limitation, either the Written GKE Agreement was amended to include the 120% Return Provision or, alternatively, Garbus is estopped to deny that the 120% Return Provision is binding on him.

5

31.    None of the four films in which Kroupa and GKE invested -- "Save Me," "Dream Boy," "Brooklyn To Manhattan" and "Latin Lyrics"-- has been distributed theatrically.

32.    "Bobby Jones Comedy All Stars: Volume I" was released to video, but Garbus has failed to provide to Kroupa any funds generated for GKE by that production, despite Kroupa's demands for same.

## Garbus' Mismanagement Of GKE And Breaches Of Fiduciary And Contractual Duties

33.    Garbus owed Kroupa and GKE contractual duties under the Written GKE Agreement and the fiduciary duties of care, loyalty and good faith.

34.    Garbus' breaches of his fiduciary duties, described further below, were intentional, willful, wanton and/or malicious in that, among other things, they were intended solely to benefit Garbus at the expense, and to the detriment, of GKE and/or Kroupa, his co-manager and co-member in GKE.

## Breaches As To Kroupa (Individually)

35.    Garbus breached contractual and fiduciary duties he owed to Kroupa and proximately caused Kroupa damages, in numerous ways, including, among other things:

a.    Purporting to commit GKE to invest substantially more money in one or more entertainment projects than was disclosed to, or agreed by, Kroupa;

b.    Transferring to himself a purported financing fee for the "Latin Lyrics" project in the amount of $260,000, without Kroupa's knowledge or consent. Under Section 10.14(b) of the Written GKE Agreement and otherwise, Garbus was entitled to receive, if anything, no more than about a $34,000 financing fee with respect to "Latin Lyrics";

c.    Failing to disburse to Kroupa in accordance with the Written GKE Agreement

6

and/or the 120% Return Provision funds that GKE received from one or more entertainment projects in which it invested, including, without limitation, the "Bobby Jones Comedy All Stars: Volume I";

     d.     Transferring to himself interest earned on funds that Kroupa, through GKE, placed in escrow to finance GKE projects, while providing none of such interest to Kroupa;

     e.     Failing to provide to Kroupa the economic benefit of a tax credit received from the State of New Mexico for filming "Save Me";

     f.     Demanding a release from Kroupa of all claims against Garbus in exchange for releasing certain funds escrowed in connection with the "Latin Lyrics" project;

     g.     Failing to provide to Kroupa financial statements and other books and records of GKE despite numerous written and oral demands for same;

     h.     Failing to share information with Kroupa, and to answer his requests for information, concerning GKE and its projects;

     i.     Failing to obtain outside financing for one or more entertainment projects in which Kroupa, through GKE, invested, including, without limitation, "Brooklyn To Manhattan," contrary to, among other things, Garbus' representations and inducements to Kroupa to invest in such projects;

     j.     Failing to negotiate project agreements that, consistent with the Written GKE Agreement, industry standards and Garbus' duty to properly preserve and protect Kroupa's investments, gave GKE management and/or ownership control over the funding and production of each entertainment project in which GKE invested;

     k.     Failing to insist, consistent with the Written GKE Agreement, industry standards and Garbus' duty to properly preserve and protect Kroupa's investments, that an auditor

7

answerable to GKE, or its functional equivalent, be retained on each entertainment project in which Kroupa, through GKE, invested;

l.    Failing to insist, consistent with the Written GKE Agreement, industry standards and Garbus' duty to properly preserve and protect Kroupa's investments, that a completion bond be posted in favor of GKE on each entertainment project in which Kroupa, through GKE, invested;

m.    Allowing the "Brooklyn To Manhattan" project to go substantially over-budget because of, among other things, inadequate spending controls and mismanagement, including with respect to funds that Kroupa, through GKE, invested in such projects;

n.    Squandering and mishandling one or more distribution opportunities on entertainment projects in which Kroupa, through GKE, invested, including, without limitation, a distribution deal for "Save Me" offered by Roadside Attractions LLC; and

o.    Otherwise grossly mismanaging entertainment projects in which Kroupa, through GKE, invested.

36.    Kroupa has performed, or is excused from performing, all obligations required of him under the Written GKE Agreement.

37.    As a direct and proximate result of Garbus' breaches of contractual and fiduciary duties, Kroupa has been damaged.  Had Garbus performed his duties as required, Kroupa would not have suffered such losses.

**Breaches As To GKE (Derivatively)**

38.    Garbus breached fiduciary duties he owed to GKE, and proximately caused GKE damages, in numerous ways, including, among other things:

a.    Purporting to commit GKE to invest excessive, highly imprudent amounts of money in one or more entertainment projects without Kroupa's knowledge or consent;

b.    Failing to obtain outside financing for one or more entertainment projects in which GKE invested, including, without limitation, "Brooklyn To Manhattan";

c.    Failing to negotiate project agreements that, consistent with the Written GKE Agreement and industry standards, gave GKE management and/or ownership control over the funding and production of each entertainment project in which GKE invested;

d.    Failing to insist, consistent with the Written GKE Agreement and industry standards, that an auditor answerable to GKE, or its functional equivalent, be retained on each entertainment project in which GKE invested;

e.    Failing to insist, consistent with the Written GKE Agreement and industry standards, that a completion bond be posted in favor of GKE on each entertainment project in which it invested;

f.    Allowing the "Brooklyn To Manhattan" project to go substantially over-budget because of, among other things, inadequate spending controls and mismanagement;

g.    Squandering and mishandling one or more distribution opportunities on entertainment projects in which GKE invested, including, without limitation, a distribution deal for "Save Me" offered by Roadside Attractions LLC; and

h.    Otherwise grossly mismanaging GKE's entertainment projects.

39.    As a direct and proximate result of Garbus' breaches of fiduciary duties, GKE has been damaged. Had Garbus performed his duties as required, GKE would not have suffered such losses.

9

40.    A demand on Garbus to cause GKE to seek redress against him for these wrongs would be futile.

## ARBITRATION CLAUSE

41.    Section 6.1(c) of the Written GKE Agreement provides for arbitration of disputes on the following terms:

> In the event of a stalemate or dispute between the Managers, the parties will attempt in good faith to resolve through negotiation any dispute, claim or controversy arising out of or relating to this Agreement. Either party may initiate negotiations by providing written notice in letter form to the other party, setting forth the subject of the dispute and the relief requested. The recipient of such notice will respond in writing within five days with a statement of its position on and recommended solution to the dispute. If the dispute is not resolved by this exchange of correspondence, then representatives of each party with full settlement authority will meet at a mutually agreeable time and place within ten days of the date of the initial notice with the assistance of a third party to be agreed upon by the Managers. In the event the parties are unable to resolve the stalemate or dispute not withstanding third party assistance the matter shall be submitted to binding arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules. Any decision by the Arbitrators shall be binding and not appealable.

42.    Kroupa has initiated the requisite good faith attempt to negotiate this dispute with Garbus by, among other things, delivering written correspondence of even date herewith. In the event that Garbus and Kroupa are unable to resolve this dispute within 10 days hereof, as set forth in Section 6.1(c) above, and the court in the Related Litigation declines to hear one or more of the claims that are also pleaded in this arbitration, then all such claims in this arbitration should proceed.

## RELIEF SOUGHT

43.    If, and to the extent that, the Related Litigation is not resolved by entry of a final, non-appealable order and/or settlement agreement, then based on the foregoing and the evidence to be

10

presented at the arbitration hearing, Kroupa, individually and/or derivatively on behalf of GKE, respectfully requests entry of the following Award(s):

    A.    An Interim and/or Final Award requiring Garbus to produce without further delay GKE's financial statements from its inception and GKE's books and records for inspection and copying by Kroupa; and

    B.    A Final Award in favor of Kroupa and against Garbus as follows:

    1.    Ordering Garbus to provide Kroupa with a full accounting of all GKE accounts and transactions;

    2.    Awarding Kroupa compensatory damages in an amount to be determined after hearing but no less than $1 million;

    3.    Awarding GKE compensatory damages in an amount to be determined after hearing but no less than $1 million;

    4.    Awarding Kroupa and GKE prejudgment interest thereon at the statutory rate of five percent per annum;

    5.    Awarding Kroupa his attorneys' fees and arbitration costs and expenses incurred in enforcing his and/or GKE's rights and in prosecuting this arbitration;

    6.    Awarding Kroupa and GKE punitive damages in an amount to be determined after hearing;

    7.    Ordering that Garbus not share in any amounts recovered by GKE hereunder;

    8.    Ordering that Garbus be and is removed as a manager of GKE;

    9.    If, but only if, the Related Litigation is not resolved by entry of a final, non-appealable Order and/or settlement agreement, which Order or settlement agreement provides that

11

the Written GKE Agreement be and is reformed to include the 120% Return Provision, then Kroupa, in the alternative to such relief, respectfully requests entry of a Final Award declaring that Kroupa is entitled to the return of an amount equal to all of his investments described above, totaling at least $10.3 million, plus a 20% return thereon, before Garbus receives any further cash or distributions of any kind from GKE or its projects; and

       10.    In the alternative to the declaration requested in the immediately preceding prayer (B.9), declaring that Kroupa is entitled to receive all distributions of any kind from GKE up to the amount of his total capital contributions to GKE, before any GKE funds are distributed to Garbus.